UNITED STATES DISTRICT COURT
DISTRICT OF SOUTH CAROLINA
CHARLESTON DIVISION

| | |
|---|---|
| RANDALL WILLIAMS, Personal Representative of the ESTATES OF SHANICE R. DANZTLER-WILLIAMS and MIRANDA R. DANTZLER-WILLIAMS, <br><br> and <br><br> BETTY SIMMONS, Personal Representative of the ESTATE OF STEPHANIE DANTZLER, <br><br> Plaintiffs, <br><br> v. <br><br> EMILY PELLETIER; CLINTON SACKS; CHARLESTON COUNTY SHERIFF'S OFFICE; and CHARLESTON COUNTY, <br><br> Defendants. | Civil Action No. 2:23-cv-02149-DCN <br><br> **FIRST AMENDED COMPLAINT** <br><br> **(Jury Trial Requested)** |

NOW COMES Plaintiff, Randall Williams, as Personal Representative of the Estates of Shanice R. Dantzler-Williams and Miranda R. Dantzler-Williams, and Betty Simmons, as Personal Representative of the Estate of Stephanie Dantzler, by and through counsel, pursuant to FRCP Rule 15(a)(1)(B) for their First Amended Complaint and allege as follows:

## PARTIES

1.      Plaintiff Randall Williams is *sui juris*, natural father and the duly appointed Personal Representative of the Estates of his natural daughters, decedents, Shanice R. Dantzler-Williams (hereinafter "Shanice") and Miranda R. Dantzler-Williams (hereinafter "Miranda") by Order of the Probate Court of Colleton County.

2.    Plaintiff Betty Simmons is *sui juris*, natural mother and the duly appointed Personal Representative of the Estate of her daughter decedent, Stephanie Dantzler (hereinafter "Stephanie") by Order of the Probate Court of Colleton County.

3.    Defendant Emily Pelletier (hereinafter "Pelletier") is *sui juris*, and was at all times relevant, a citizen and resident of the State of South Carolina, who was acting under color of law and within the course and scope of her employment with Charleston County and agency as a Deputy of the Charleston County Sheriff's Office. She is also sued in her individual capacity for compensatory and punitive damages under federal law.

4.    Defendant Clinton Sacks (hereinafter "Sacks") is *sui juris,* and was at all times relevant, a citizen and resident of the State of South Carolina, who was acting under color of law and within the course and scope of his employment with Charleston County and agency as a Deputy of the Charleston County Sheriff's Office. He is also sued in his individual capacity for compensatory and punitive damages under federal law.

5.    Defendant Charleston County Sheriff's Office ("CCSO") is a department of the Charleston County political subdivision organized and existing pursuant to the laws of the State of South Carolina and is located within Charleston County who acted by and through its agents / employees, and Deputies, including, but not limited to, Defendants Pelletier and Sacks, and its primary and final policymakers, including, Sheriff Kristin Graziano ("Graziano") and former Sheriff Al Cannon.

6.    Defendant Charleston County ("Charleston County") is a political subdivision existing under the laws of the State of South Carolina and located in Charleston County, South Carolina who at all times acted by and through its agents, servants, and/or employees including, but not limited to:

a. Its primary policymakers Charleston County Council and the County Administrator as County Council serves as a link between County government and the citizens, municipalities and agencies located within Charleston County, and also represents the area's concerns and interests.

b. The call takers, law dispatchers, law enforcement dispatchers, supervisors, and its Director, as the primary policymaker of the Charleston County Consolidated 911 Center aka Consolidated Dispatch Center ("Dispatch"), who are all County employees within that agency/department of Charleston County, who were all acting within the course and scope of their employment and agency pursuant to County policies;

c. The Charleston County Safety & Risk Management Office, its Department Head, and Employees who ensure that the risks of the County's assets, liabilities and employees are adequately insured, including all those of CCSO and all the County property that is used by and furnished to the CCSO, processes insurance claims related to County property and equipment, maintains all property, vehicle, equipment, insurance claim files for the County, conducts monthly Vehicle Collision Review Board (VCRB) meetings, and trains all County employees in general safety awareness, including defensive driving.

7. Charleston County, by law, per S.C. Code Section § 4-1-80, and pursuant to prior acts of Council, budgets for and pays for the entirety of the operations of the CCSO, (roughly $82 million for 2022) necessary to the proper transaction of the legitimate business of the CCSO since CCSO lacks the authority to levy taxes or establish a budget, and for the benefit and public safety of the citizens of the County of Charleston, and as such:

a. owns, maintains, insures, entrusts and furnishes all County Property to CCSO including the patrol vehicles and equipment ("County Vehicles") used by CCSO and its Deputies, (including the County Vehicles used by Deputies Pelletier and Sacks);

b. pays for all Deputy training, salaries, and benefits as County employees, including Deputies Pelletier and Sacks;

c. indemnifies CCSO and in turn Charleston County from all risks of its operations through the purchase of insurance and/or payment of claims made against CCSO and Deputies; and

d. pays for all liabilities incurred by CCSO incidental to the proper transaction of its legitimate business.

8. This Court has subject matter jurisdiction over all claims alleged and personal

jurisdiction over the parties.

9.      Plaintiffs bring these survival, wrongful death and civil rights actions on behalf of the decedents and their heirs and statutory beneficiaries pursuant to S.C. Code § 15-51-90, § 15-5-10, 42 U.S.C. § 1983 and 42 U.S.C. § 1988 as well as the common law of South Carolina.

10.      Venue is proper in that a substantial part of the acts and omissions alleged herein occurred in Charleston County, South Carolina.

## ACTS & OCCURRENCES

11.      Each and every act of negligence, gross negligence, recklessness, and/or willful and wanton conduct by any one or more of the Defendants, and their incorporation into the causes of action set forth *infra,* constitute multiple acts and/or occurrences as may be determined by a jury, under applicable South Carolina law and/or statutes, including § 15-18-10 *et seq.*

## FACTUAL ALLEGATIONS

### A. DEPUTY DRIVING DATA

12.      The County, by and through its Dispatch, captures and records every 6-30 seconds, depending on the County Vehicle, the exact speed, heading, and location of the driving of every on-duty Deputy in every County Vehicle, including as to any Incident that a Deputy is responding to (hereinafter "Deputy Driving Data"). *See excerpts from Deputy Driving Data shown below*:[1]

| Date_Time | Latitude | Longitude | Radio_Name | Location | Heading | Speed | City |
|---|---|---|---|---|---|---|---|
| 2021-12-03 17:29:46.687 | 32840956 | 79967865 | SO236 | INTERSTATE 26 WEST\BAKER HOSPITAL BLVD | 310 | 57 | NORTH CHARLESTON |
| 2021-12-03 17:30:10.707 | 32842293 | 79974871 | SO236 | INTERSTATE 26 EAST\26 E / COSGROVE AV ON RAMP | 274 | 57 | NORTH CHARLESTON |
| 2021-12-03 17:30:34.833 | 32844638 | 79979168 | SO236 | 26 W 216B OFF RAMP\COSGROVE AV | 317 | 28 | NORTH CHARLESTON |
| 2021-12-03 17:31:10.697 | 32845571 | 79979452 | SO236 | COSGROVE AV\26 W 216B OFF RAMP | 6 | 25 | NORTH CHARLESTON |
| 2021-12-03 17:31:46.730 | 32846592 | 79979332 | SO236 | COSGROVE AV\AZALEA DR | 350 | 5 | NORTH CHARLESTON |
| 2021-12-03 17:32:34.720 | 32847068 | 79980262 | SO236 | DUNDEE\BAILEY DR | 280 | 25 | NORTH CHARLESTON |

---

[1] Latitude and Longitude Data is presented without spaces and 32842293 is actually 32° 84' 42.293"

13.    Deputies also receive turn-by-turn driving directions in their County Vehicles from Dispatch that provides the safest and most direct route for the Deputies to follow when responding to Incidents.

14.    Deputy Driving Data further records each and every time a Deputy engages in a "Route Deviation" and does not follow the turn-by-turn driving instructions provided to them by Dispatch in responding to an Incident. *See excerpts from Deputy Driving Data shown below:*

| Date_Time | Activity | Location | Comment |
|---|---|---|---|
| 2021-12-03 21:24:20.373 | Route Deviation | CAMP\~1 | Unit SO236 deviated from original dri[redacted] |
| 2021-12-04 02:58:01.920 | Route Deviation | RIVER\JENKINS FARM RD | Unit SO236 deviated from original dri[redacted] |
| 2021-12-04 18:45:32.113 | Route Deviation | MAYBANK HWY\OLD FOLLY RD | Unit SO236 deviated from original dri[redacted] |
| 2021-12-05 03:05:22.273 | Route Deviation | RIVERLAND\CAMP RD | Unit SO236 deviated from original dri[redacted] |
| 2021-12-06 03:17:00.757 | Route Deviation | MAYBANK\BROWNSWOOD RD | Unit SO236 deviated from original dri[redacted] |
| 2021-12-09 00:24:06.603 | Route Deviation | CAMP\~1 | Unit SO236 deviated from original dri[redacted] |
| 2021-12-09 21:19:36.407 | Route Deviation | RIVER\ABBAPOOLA RD | Unit SO236 deviated from original dri[redacted] |

15.    Defendant Charleston County further archives all Deputy Driving Data, such that every minute of Deputy driving can be easily retrieved, reviewed, and audited at any time to see each and every time a Deputy was either speeding and/or deviating from Dispatch provided turn-by-turn driving instructions in their County Vehicle.

16.    Per CCSO policy, driving by Deputies of their County Vehicles is further captured on dash camera video, ("Dash Cam Video") that captures and records the County Vehicle's speed, use of emergency lights and audible sirens, and other data points, and is triggered by any of the following actions of a Deputy:

    a.    Automatically - by driving at a speed in excess of 90 miles per hour[2];

    b.    Manually – by switching on manually the emergency lights and sirens; and

    c.    Manually - by switching on the video camera.

---

[2]    Per CCSO Policy, and a setting within the County Vehicles, the video camera only automatically recorded driving when the vehicle speed exceeded 90 mph. By setting the limit at such an outrageously high and dangerous number, Deputies knew they could speed anytime, anywhere at up to 89 mph with impunity as there would be no video evidence of their behavior.

17.     All Dash Cam Video is also archived by Charleston County and CCSO and is readily accessible and reviewable by Charleston County and/or CCSO.

18.     The existence of all of this Deputy Driving Data, that includes, at times, Dash Cam Video, (collectively "Deputy Driving Data") means that every act of dangerous and/or unlawful Deputy driving behavior, including those Deputies engaged in reckless and unlawful speeding, as well as those Deputies deviating from the turn-by-turn driving directions provided by Dispatch, is at all times captured, known, and easily reviewable by Charleston County, CCSO, and/or Sheriff Graziano.

## B.  THE TRAINING FAILURES OF DEPUTY PELLETIER

19.     As was extensively documented and publicly reported[3], the training records of Deputy Pelletier, just six months before she caused the deaths of mother Stephanie Dantzler, and her daughters Shanice and Miranda Williams on 5/8/22, see *infra*, showed numerous instances where Deputy Pelletier: (1) struggled tremendously with geography, including an inability to know her location (and follow driving directions); and (2) operated her County Vehicle in a dangerously unsafe manner including driving through a Stop Sign during training without using her emergency lights as well as engaging in unsafe and dangerous passing while driving.

20.     Specifically, on 10/24/21, her 24th day of training, she did not know her way around a District she had worked in over the last two days, but was still graded that day as a 4 (high acceptable) Driving/ Orientation- Non-Stress Conditions.[4]

a.     Her Field Training Instructor noted: "Deputy Pelletier needs to focus on

---

[3] *"Docs: Charleston deputy charged in crash 'struggled' behind wheel in training,"* Sabol, Blair: Jan. 6, 2023 https://www.live5news.com/2023/01/06/docs-charleston-deputy-charged-crash-struggled-behind-wheel-training/

[4] CCSO's own Field Training Evaluation Form uses a Rating Scale of 1-5 in evaluating conduct with the grade of 1 as the only grade demonstrating Unacceptable performance.

learning her district more and paying attention to her surrounding streets."

b. Pelletier herself wrote, "Today I feel I could improve on my knowledge of the district I am working."

21.     Again, on 10/28/21, her 26th day of training, she again did not know her way around a District, but was still graded that day as a 2 (acceptable) Driving/ Orientation-Non-Stress Conditions.

a. Her Field Training Instructor noted: "Deputy Pelletier continues to struggle tremendously with geography. Deputy Pelletier had worked the east district for nearly 6 weeks in phase one and still has no idea where she is at or landmarks. I would ask her to tell me what community she was in and she could not tell me." "She needs to use her resources she has available while on shift and trust them."

b. Pelletier herself wrote, "I need to do better with geography. There is no excuse for not knowing the location when I am in the East…"

22.     On 11/1/21, on her 27th day of field training, **she turned off her emergency lights and disregarded a stop sign without clearing the intersection** but still was graded that day as a 2 (acceptable) in Field Performance – Driving/Stressful Conditions. (emphasis added).

a. Her Field Training Instructor noted: "Deputy Pelletier and I spoke about the incident and how to break tunnel vision to eliminate simple mistakes that can have greater consequences while conducting her job."

b. Pelletier herself wrote, "I also need to be more observant when running Code 3."

23.     On 11/15/21, on her 34th day of field training, she drove Code 3 (lights and sirens) and almost caused a head-on collision but was still graded that day as a 3 (acceptable) in Field Performance – Driving/Stressful Conditions.

a. Her Field Training Instructor noted: "I advised Deputy Pelletier we could've been involved in a head on collision… Deputy Pelletier was advised to just slow down and wait for others to move out of the way where she could safely proceed around and get to her destination."

b. Pelletier herself wrote, "Today I felt I could have improved on being more aware of my environment while running code…"

24.     The next day, on 11/16/21, on her 35th day of field training, she drove Code 3

(lights & sirens) and was graded that day as a 3 (acceptable) in Field Performance –
Driving/Stressful Conditions.

    a.  Her Field Training Instructor noted: "Deputy Pelletier has to work on her
code 3 response and decision making while running code and which routes
would be best to take when traffic is extremely heavy and maneuvering slow
and methodical."

    b.  Pelletier herself wrote, "Today I felt I could improve on finding better ways
to get through traffic while running code that is both safe and efficient."

25.    After only 7 more training days under a Field Training Instructor, on 11/30/21 she
completed her final field training phase and was recommended for advancement.

26.    Thereafter, in accordance with CCSO policy and/or custom, Deputy Pelletier was
(1) never rated as unacceptable; (2) her Deputy Driving Data was never reviewed; and (3) she
received no monitoring, follow-up, or remedial training of any kind.

27.    Thereafter, Deputy Pelletier's Driving Data showed numerous instances where she
ignored the turn-by-turn directions provided by Dispatch and engaged in Route Deviations.

28.    The following is a list of Deputy Pelletier's Route Deviations in the **one month**
following her recommendation for advancement. (emphasis added)

| Date_Time | Activity | Location | Comment |
|---|---|---|---|
| 2021-12-03 21:24:20.373 | Route Deviation | CAMP\~1 | Unit SO236 deviated from original dri[redacted] |
| 2021-12-04 02:58:01.920 | Route Deviation | RIVER\JENKINS FARM RD | Unit SO236 deviated from original dri[redacted] |
| 2021-12-04 18:45:32.113 | Route Deviation | MAYBANK HWY\OLD FOLLY RD | Unit SO236 deviated from original dri[redacted] |
| 2021-12-05 03:05:22.273 | Route Deviation | RIVERLAND\CAMP RD | Unit SO236 deviated from original dri[redacted] |
| 2021-12-06 03:17:00.757 | Route Deviation | MAYBANK\BROWNSWOOD RD | Unit SO236 deviated from original dri[redacted] |
| 2021-12-09 00:24:06.608 | Route Deviation | CAMP\~1 | Unit SO236 deviated from original dri[redacted] |
| 2021-12-09 21:19:36.407 | Route Deviation | RIVER\ABBAPOOLA RD | Unit SO236 deviated from original dri[redacted] |
| 2021-12-09 22:07:41.110 | Route Deviation | RIVERLAND\CAMP RD | Unit SO236 deviated from original dri[redacted] |
| 2021-12-10 00:32:32.800 | Route Deviation | 503 Main Rd [CIRCLE K (MAIN/ | Unit SO236 deviated from original dri[redacted] |
| 2021-12-10 01:36:21.350 | Route Deviation | RIVER\MAYBANK HWY | Unit SO236 deviated from original dri[redacted] |
| 2021-12-15 02:58:02.123 | Route Deviation | RIVERLAND\DAWSON RD | Unit SO236 deviated from original dri[redacted] |
| 2021-12-17 18:14:31.277 | Route Deviation | COSGROVE AV\26 E / COSGRO | Unit SO236 deviated from original dri[redacted] |
| 2021-12-18 02:49:34.677 | Route Deviation | MAYBANK\WALTER DR | Unit SO236 deviated from original dri[redacted] |
| 2021-12-18 17:52:59.660 | Route Deviation | JAMES ISLAND EXPWY\JAMES | Unit SO236 deviated from original dri[redacted] |
| 2021-12-19 03:35:44.243 | Route Deviation | RIVERLAND\WOODLAND SHO | Unit SO236 deviated from original dri[redacted] |
| 2021-12-19 05:32:31.360 | Route Deviation | WOODLAND SHORES\WOODL | Unit SO236 deviated from original dri[redacted] |
| 2021-12-19 18:05:15.823 | Route Deviation | MAIN\MAIN RD | Unit SO236 deviated from original dri[redacted] |
| 2021-12-19 19:37:25.650 | Route Deviation | MAYBANK\FENWICK HALL ALY | Unit SO236 deviated from original dri[redacted] |
| 2021-12-19 21:18:09.853 | Route Deviation | FOX CROFT\BIRCHDALE DR | Unit SO236 deviated from original dri[redacted] |
| 2021-12-20 02:04:26.833 | Route Deviation | MAYBANK\HEADQUARTERS PL | Unit SO236 deviated from original dri[redacted] |
| 2021-12-22 22:08:14.803 | Route Deviation | MAYBANK\HEADQUARTERS PL | Unit SO236 deviated from original dri[redacted] |
| 2021-12-23 18:30:08.000 | Route Deviation | FOLLY RD\COUNTRY CLUB DR | Unit SO236 deviated from original dri[redacted] |
| 2021-12-27 19:41:03.770 | Route Deviation | MAIN\CHISOLM RD | Unit SO236 deviated from original dri[redacted] |
| 2021-12-27 21:26:42.913 | Route Deviation | BOHICKET\PARTNERSHIP LN | Unit SO236 deviated from original dri[redacted] |
| 2021-12-28 03:42:07.440 | Route Deviation | MAYBANK\WALTER DR | Unit SO236 deviated from original dri[redacted] |
| 2021-12-28 04:47:34.427 | Route Deviation | N EDENVALE\BOHICKET RD | Unit SO236 deviated from original dri[redacted] |
| 2021-12-28 19:45:50.213 | Route Deviation | MAYBANK\HEADQUARTERS PL | Unit SO236 deviated from original dri[redacted] |

29.     In the five (5) months that followed, Deputy Pelletier's Driving Data showed she engaged in a consistent pattern of Route Deviations and an inability to follow the turn-by-turn driving directions provided by Dispatch.

30.     **The following is a list of the total of the 130 times** Deputy Pelletier's Route Deviations appeared in her Deputy Driving Data in response to her Incident Responses in the five (5) months preceding the 5/8/22 crash that killed Stephanie, Shanice and Miranda, set forth in *Exhibit A – Pelletier's Route Deviations*, and incorporated by reference.



C.  DEPUTIES ARE NOT AUTHORIZED TO SPEED UNLESS IT IS AN EMERGENCY

31.     CCSO Deputies regularly and routinely receive calls for service from Charleston County Consolidated Dispatch ("Dispatch") who receives 911 calls from the public.

32.     The Emergency Driving Code Responses of Deputies are classified as either Code 1, 2, or 3 depending on the threat to public safety and the urgency of the response needed. *(See*

*CCSO Vehicle Operations Policy 1-08; CCSO Emergency Vehicle Operations & Driving Course Material*s)

33.     The call of a "Stalled Vehicle" mandates the Deputy to respond Code 1 and follow Non-Emergency Vehicle Operations per South Carolina law and CCSO Policy, that requires the responding Deputy to:

      a.   Respond via the most direct route; and

      b.   Obey all traffic laws.

34.     Deputies also receive turn-by-turn driving directions in their County Vehicles from Dispatch, providing the safest and most direct route for the Deputies to follow to respond.

35.     In responding Code 1, using emergency lights and audible sirens on a County Vehicle is neither authorized nor necessary as a Deputy responding Code 1 is legally required to obey all traffic laws and travel at the posted speed limit.

36.     Deputies know they must at all times obey all traffic laws unless they are specifically granted the legal privilege to disregard them as set forth in South Carolina law.

37.     Further, Deputies also know that if, and only if, they are so authorized to exceed the posted safe speed limits and disregard other traffic laws, **the use of emergency lights and audible sirens to warn others is mandatory**.[5] (emphasis added).

D. THE UNLAWFUL "RACING" OF SACKS & PELLETIER TO A NON-EMERGENCY[6]

38.     At approximately 10:30 p.m. on Mother's Day, May 8, 2022, Deputies Pelletier

---

[5] The only exception for not using emergency lights and audible sirens while speeding is for a Code 2 Response when the Deputy is engaged in surveillance, responding to a crime in progress, or obtaining evidence of speeding.

[6] The term "Racing" is used to describe the outrageous and life-threatening speed of the driving of Deputies Pelletier and Sacks in response to the Stalled Vehicle call, although the evidence set forth *infra* is certainly capable of an inference that Pelletier and Sacks engaged in a "race" with each other to see who could get to the Stalled Vehicle first.

and Sacks were working in Charleston County, in uniform, and driving County Vehicles owned by Charleston County and furnished to CCSO.

39.    At that time, Deputies Pelletier and Sacks were finishing up a call and were located on Edisto Island near Jehossee Road.

40.    At approximately 10:41 p.m. a motorist in a Stalled Vehicle called Dispatch.

41.    Charleston County, as a matter of County policy, elected to provide assistance to motorists with vehicle issues on its roads who call Dispatch looking for help.

42.    Charleston County determines what resources of the County are to be deployed in response to these motorists' requests.

43.    Charleston County, as a matter of County policy, has directed Dispatch to use the CCSO and its Deputies to respond to these non-law enforcement requests for motorist assistance on County roadways.

44.    At approximately 10:42 p.m. Defendant Pelletier received a call from Dispatch of a non-emergency Stalled Vehicle on Highway 17 and responded Code 1.

45.    Deputy Sacks, who had been a Deputy for approximately six (6) years at the time, was not dispatched to the call but decided to respond as well (Code 1) because nothing else was going on. *("There were only two of us, so we were rolling together, so I got out with it.") (5/11/12 Deputy Sacks Interview by SCHP 4:46-4:55).*

46.    Deputy Sacks further knew that Deputy Pelletier was a recently hired Deputy who was unfamiliar with the area they were working.

47.    Given the non-emergency Stalled Vehicle call, and their Code 1 responses, both Deputy Sacks and Pelletier knew they were legally required to obey all traffic laws in responding.

48.     Deputies Pelletier and Sacks both received turn-by-turn driving directions in their County Vehicles from Dispatch that they were to follow to respond to the Stalled Vehicle.

49.     The turn-by-turn driving directions from Dispatch instructed Deputies Pelletier and Sacks to travel up Highway 174 from Edisto Island toward Highway 17, then turn right on Highway 17 to reach the Stalled Vehicle. (*See blue line on map below broken into Sections A-D*):



50.     Deputy Pelletier's and Sacks' Driving Data from each of their County Vehicles, showing the exact time, vehicle speed, latitude, and longitude of their entire route of travel from the beginning of this call until The Crash, see *infra*, is set forth and summarized in table form along with explanations. *See Exhibit B - Pre-Crash Deputy Racing Data - Compared; Exhibit C – Deputy*

*Pelletier's Driving Data; and Exhibit D – Deputy Sacks Driving Data* and are all incorporated herein by reference and collectively referred to as "Deputy Racing Data".[7]

51.     Deputy Sacks admitted he and Deputy Pelletier both left the location on Highway 174 near Jehossee Road at the same time. *("So, Deputy Pelletier and myself were on Edisto Island." … "We both left Edisto together.") (5/11/12 Deputy Sacks Interview by SCHP 1:14-1:28).*

52.     As the Deputy Racing Data shows, Deputy Sacks (SO158) was the first to leave the scene and as the senior Deputy, set the example for, assisted, and encouraged the new Deputy Pelletier (SO236) to disregard the traffic laws and not switch on her emergency lights and sirens in responding to this non-emergency call of a Stalled Vehicle:



| PELLETIER Date_Time | | Latitude | SO236 Speed | SO158 Speed | SPEED LIMIT | SO236 Over Limit | SO158 Over Limit | SACKS Date_Time | | Latitude | Feet Behind | ELAPSED TIME |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 2022-05-08 22:39:25.787 | | 32583470 | 0 | 0 | 55 | | | 2022-05-08 22:38:41.160 | | 32583470 | | |
| 2022-05-08 22:42:23.880 | | 32584203 | 43 | 50 | 55 | | | 2022-05-08 22:42:21.193 | | 32584203 | | 0:00:23 |
| SACKS is leading PELLETIER | | | | | | | | | | | | |
| PELLETIER gets to identical Latitude 2.7 secs after SACKS (Latitude increases moving towards Hwy 17 from Edisto) | | | | | | | | | | | | |

53.     As Deputies Sacks and Pelletier raced up the unlit rural Highway 174 to the non-emergency Stalled Vehicle, in violation of South Carolina law, neither of them switched on their emergency lights nor audible sirens, thus preventing the automatic recording of the Dash Cam Video in their County Vehicles.

---

[7] Note: *Exhibit B - Pre-Crash Deputy Racing Data* includes additional data and explanatory notes that is not in their individual Deputy Driving Data, including the speed over the speed limit, approximate elapsed time of the response, and an estimate of the distance Pelletier was behind Sacks as they sped up Hwy 174 by calculating latitude differentials (distance apart) at the same points in time.

54. Per the Deputy Racing Data, within 45 seconds, both Deputies Pelletier and Sacks greatly exceeded the posted speed limit responding to the non-emergency Stalled Vehicle without switching on their emergency lights or audible sirens.

| PELLETIER Date_Time | Latitude | SO236 Speed | SO158 Speed | SPEED LIMIT | SO236 Over Limit | SO158 Over Limit | SACKS Date_Time | Latitude | Feet Behind | ELAPSED TIME |
|---|---|---|---|---|---|---|---|---|---|---|
| 2022-05-08 22:42:45.977 | 32588911 | 58 | 68 | 55 | 3 | 13 | 2022-05-08 22:42:41.460 | 32589164 | 253 | 0:00:45 |
| 2022-05-08 22:43:05.883 | 32594513 | 74 | 71 | 55 | 19 | 16 | 2022-05-08 22:43:03.303 | 32595495 | 982 | 0:01:05 |
| 2022-05-08 22:43:28.023 | 32601097 | 79 | 70 | 55 | 24 | 15 | 2022-05-08 22:43:23.210 | 32601097 | | 0:01:27 |
| 2022-05-08 22:43:50.117 | 32607727 | 71 | 79 | 55 | 16 | 24 | 2022-05-08 22:43:45.337 | 32607638 | | 0:01:49 |
| 2022-05-08 22:44:10.007 | 32613956 | 77 | 80 | 55 | 22 | 25 | 2022-05-08 22:44:05.227 | 32614268 | | 0:02:09 |

55. Per the Deputy Racing Data, this unlawful, unauthorized, and life-threatening speeding, by Deputy Pelletier and Deputy Sacks, would continue throughout their driving, covering 19 miles in approximately 15 minutes.

56. Per the Deputy Racing Data, approximately three (3) minutes into their response, **<u>Deputy Pelletier reached a conscience shocking speed of 91 miles per hour trying to catch up to Deputy Sacks</u>** who had already reached speeds of 80 miles per hour. (emphasis added).

| PELLETIER Date_Time | Latitude | SO236 Speed | SO158 Speed | SPEED LIMIT | SO236 Over Limit | SO158 Over Limit | SACKS Date_Time | Latitude | Feet Behind | ELAPSED TIME |
|---|---|---|---|---|---|---|---|---|---|---|
| 2022-05-08 22:45:03.913 | 32629003 | 68 | | 55 | 13 | | | | | 0:03:03 |
| 2022-05-08 22:45:08.960 | 32630230 | 64 | 80 | 55 | 9 | 25 | 2022-05-08 22:45:09.353 | 32634740 | 4510 | 0:03:08 |
| 2022-05-08 22:45:13.853 | 32631169 | 66 | | 55 | 11 | | | | | 0:03:13 |
| 2022-05-08 22:45:19.367 | 32632792 | 72 | | 55 | 17 | | | | | 0:03:19 |
| 2022-05-08 22:45:25.040 | 32634545 | 73 | | 55 | 18 | | | | | 0:03:24 |
| 2022-05-08 22:45:30.007 | 32635944 | 68 | 78 | 55 | 13 | 23 | 2022-05-08 22:45:29.243 | 32640924 | 4980 | 0:03:29 |
| 2022-05-08 22:45:35.587 | 32637340 | 71 | | 55 | 16 | | | | | 0:03:35 |
| 2022-05-08 22:45:41.727 | 32639455 | 80 | | 55 | 25 | | | | | 0:03:41 |
| 2022-05-08 22:45:48.117 | 32641117 | 87 | | 55 | 32 | | | | | 0:03:47 |
| 2022-05-08 22:45:52.727 | 32643141 | 91 | 77 | 55 | 36 | 22 | 2022-05-08 22:45:51.257 | 32647555 | 4414 | 0:03:52 |
| 2022-05-08 22:45:58.383 | 32645262 | 88 | | 55 | 33 | | | | | 0:03:58 |
| 2022-05-08 22:46:04.180 | 32647179 | 86 | | 55 | 31 | | | | | 0:04:03 |
| 2022-05-08 22:46:10.603 | 32649115 | 82 | 73 | 55 | 27 | 18 | 2022-05-08 22:46:11.460 | 32653158 | 4043 | 0:04:10 |

57. As the two speeding Deputies approached the signs at the Willtown Road intersection, Deputy Sacks sped past the signs, following the Dispatch turn-by-turn driving directions, and continued speeding towards Highway 17.

58.    Deputy Pelletier was still speeding, without switching on her emergency lights or audible sirens, well behind Sacks, as she too passed the signs located at the Willtown Road intersection: *(photo below)*



59.    Deputy Pelletier then became confused as to the proper route to travel, just as she had demonstrated numerous times in training.

60.    At 10:49 pm, after initially driving past the signs at Willtown Road, (#1) Deputy Pelletier disregarded the turn-by-turn directions from Dispatch, turned around (#2), and then turned down Willtown Road (#3), triggering a Route Deviation notice.

61.    These actions are documented from Deputy Pelletier's Driving Data and Incident Response and are depicted and summarized below:



| 5/8/2022 | 22:49:32 | SO236 | Route Deviation | HIGHWAY 174\WILLTOWN RD | Unit SO236 deviated from original driving directions route | SO236 |
|---|---|---|---|---|---|---|

| | PELLETIER Date_Time | Latitude | SO236 Speed | SO158 Speed | SPEED LIMIT |
|---|---|---|---|---|---|
| **1** | **WILLTOWN ROAD - Sign: To Charleston - Hwy 164 Turn** | | | | |
| | 2022-05-08 22:49:31.547 | 32705910 | **70** | | 55 |
| | 2022-05-08 22:49:37.140 | 32707209 | **55** | | 55 |
| | 2022-05-08 22:49:42.580 | 32708226 | **49** | 66 | 55 |
| | 2022-05-08 22:49:47.220 | 32709179 | **37** | | 55 |
| | 2022-05-08 22:49:52.907 | **32709636** | **20** | | 55 |
| **2** | **PELLETIER turns around to go back to turn down Hwy 164** | | | | 55 |
| | **2022-05-08 22:50:03.673** | 32709195 | **35** | 63 | 55 |
| | 2022-05-08 22:50:07.923 | 32708545 | **45** | | 55 |
| | 2022-05-08 22:50:13.063 | 32707408 | **48** | | 55 |
| | 2022-05-08 22:50:18.173 | 32706704 | **36** | | 55 |
| **3** | **PELLETIER turns down Hwy 164** | | | | |
| | 2022-05-08 22:50:23.033 | 32706300 | **20** | 24 | 55 |

62.     Thereafter, Deputy Pelletier continued speeding down the unlit, rural Willtown Road reaching a top speed of 76 miles per hour all without switching on her emergency lights or audible sirens.

63.     Meanwhile, Defendant Sacks continued his unlawful speeding up Highway 174, following the turn-by-turn directions given from Dispatch, and then turned right onto Highway 17.

64.     This placed Deputies Pelletier and Sacks racing at unlawful speeds, on two different paths of travel to the Stalled Vehicle as is depicted below:



65.     Deputy Pelletier then engaged in "conscience shocking" speeding as she turned onto New Road as confirmed by Defendant CCSO (using Pelletier's Deputy Driving Data) as part of their internal investigation[8]: *(excerpt below)*

I reviewed the Global Positioning System data from Deputy Pelletier's Computer-aided Dispatch. It revealed, Deputy Pelletier was traveling at speeds exceeding the posted speed limit of 45 miles per hour (mph) on New Road. From 22:54:50 hours to 22:56:56 hours, Deputy Pelletier's lowest recorded speed was 61 mph. The last documented speed was recorded at 22:57:01 hours and is listed at 82 mph.

---

[8]  Note the Deputy Driving Data of Deputy Pelletier was apparently only reviewed as to her driving on New Road and Deputy Sacks' Driving Data was not reviewed at all by CCSO as part of their investigation. No Deputy Driving Data was made part of the SCHP report. See *infra.*

66.     Deputy Pelletier's Driving Data **shows that she continually increased her speed from 25 mph to 82 mph over the entire 3 mile stretch of the unlit, rural, New Road as she approached Highway 17.** (emphasis added). (*Excerpt below*)

| PELLETIER Date_Time | Latitude | SO236 Speed | SPEED LIMIT | SO236 + |
|---|---|---|---|---|
| 2022-05-08 22:54:18.737 | 32728604 | 25 | 45 | -20 |
| 2022-05-08 22:54:24.503 | 32729010 | 24 | 45 | -21 |
| 2022-05-08 22:54:28.723 | 32729697 | 46 | 45 | 1 |
| 2022-05-08 22:54:34.410 | 32730884 | 55 | 45 | 10 |
| 2022-05-08 22:54:40.330 | 32732210 | 57 | 45 | 12 |
| 2022-05-08 22:54:45.177 | 32733328 | 59 | 45 | 14 |
| 2022-05-08 22:54:50.473 | 32734723 | 61 | 45 | 16 |
| 2022-05-08 22:54:55.987 | 32735689 | 62 | 45 | 17 |
| 2022-05-08 22:55:01.067 | 32737190 | 63 | 45 | 18 |
| 2022-05-08 22:55:07.143 | 32738371 | 62 | 45 | 17 |
| 2022-05-08 22:55:11.003 | 32739341 | 61 | 45 | 16 |
| 2022-05-08 22:55:16.130 | 32740730 | 61 | 45 | 16 |
| 2022-05-08 22:55:21.237 | 32741914 | 60 | 45 | 15 |
| 2022-05-08 22:55:27.177 | 32743419 | 64 | 45 | 19 |
| 2022-05-08 22:55:32.083 | 32744494 | 67 | 45 | 22 |
| 2022-05-08 22:55:38.190 | 32746434 | 71 | 45 | 26 |
| 2022-05-08 22:55:44.160 | 32748159 | 71 | 45 | 26 |
| 2022-05-08 22:55:49.130 | 32749559 | 71 | 45 | 26 |
| 2022-05-08 22:55:55.130 | 32751171 | 71 | 45 | 26 |
| 2022-05-08 22:56:01.113 | 32752894 | 70 | 45 | 25 |
| 2022-05-08 22:56:06.097 | 32754297 | 68 | 45 | 23 |
| 2022-05-08 22:56:11.020 | 32755265 | 67 | 45 | 22 |
| 2022-05-08 22:56:17.020 | 32756877 | 69 | 45 | 24 |
| 2022-05-08 22:56:23.113 | 32758923 | 74 | 45 | 29 |
| 2022-05-08 22:56:29.113 | 32760645 | 75 | 45 | 30 |
| 2022-05-08 22:56:34.490 | 32762364 | 75 | 45 | 30 |
| **SACKS arrives at Stalled Vehicle** | | | | |
| 2022-05-08 22:56:40.177 | 32763871 | 78 | 45 | 33 |
| 2022-05-08 22:56:45.207 | 32765491 | 81 | 45 | 36 |
| 2022-05-08 22:56:51.177 | 32767429 | 82 | 45 | 37 |
| 2022-05-08 22:56:56.770 | 32769366 | 81 | 45 | 36 |
| 2022-05-08 22:57:01.223 | 32770969 | 82 | 45 | 37 |

67.     At 22:55:58, the exact same time that Deputy Pelletier was also engaged in "conscience shocking" speeding on the unlit New Road, Deputy Sacks was also dangerously speeding at 79 mph without switching on his emergency lights or audible siren *(as is shown in his Dash Cam Video that he manually switched on – screenshot below).*



68.     As the Deputy Racing Data shows, Deputies Pelletier and Sacks both stayed just below the 90-mph threshold to avoid automatic Dash Cam Video capture of their unlawful driving.

E.      <u>DEVIATIONS, DELIBERATE INDIFFERENCE, & DEATH</u>

69.     Prior to and at the time they were unlawfully racing on the night of May 8, 2022, both Deputies Pelletier and Sacks had completed South Carolina Criminal Justice Academy training.

70.     As a result of that training, both Deputy Pelletier and Sacks knew:

    a.  Deputies spend more time behind the wheel than any other place;

    b.  As Deputies spend more time behind the wheel than in any other place, it is imperative that an officer possess driving skills that are superior to those of the general motoring public;

    c.  "Excessive speeds are seldom, if ever, warranted since the Deputy has, as their first duty, to get to the scene before they can be of any assistance"; and

    d.  **<u>When authorized, the use of emergency lights and audible signal when traveling over the posted speed limit is mandatory,</u>** especially as fatal collisions are 2 ½ times more likely to occur at night than in daylight because of the difficulty

of visual perception at night due to the darkness, which causes Deputies to lose many of the "cues" they depend on in daylight for judging distances. *(Excerpts South Carolina Basic Law Enforcement Student Manual (2010)).*

71.     Accordingly, Deputies Pelletier and Sacks knew the extreme dangers and lethality a County Vehicle posed to people on the roads, as a County Vehicle is more lethal than a handgun.

*(CJA Academy Training Materials - Lesson Plan Outline - Driving Training):*

| .44 MAGNUM REVOLVER | CAR |
|---|---|
| Weight of Bullet.........................240 grains | Weight of Vehicle.............4,000 lbs. |
| Muzzle Velocity...........1,600 fps. (1,090 mph) | Velocity.............................88.02 fps (60 mph) |
| Foot-Pounds of Energy at Muzzle.........1,400 | Foot-Pounds of Energy at Impact with a Stationary Object......app. 480,000 |
| PEOPLE IT COULD KILL - MAYBE 4 WITH AN AVERAGE OF 325 FP PER PERSON | PEOPLE IT COULD KILL – ABOUT 1,477 WITH AN AVERAGE OF 325 FP PER PERSON |

72.     Those training materials further instructed Deputies Pelletier and Sacks regarding reaction time:

> Driving Techniques
>
> a.     The elements of reaction time
>
> Reaction time depends on two things: the driver's awareness and the driver's attention. The average perception/reaction time is 1.6 seconds. That is the time it takes for a driver to observe, recognize the hazard, decide what to do, and finally initiate that decision. For example: in 1.6 seconds at 60 mph, you will travel approximately 44 yards before you can react - almost half the length of a football field.

73.     Furthermore, as a result of their training, on May 8, 2022, both Deputies Pelletier and Sacks knew:

    a.     A stalled vehicle mandated a Code 1 Response; and

    b.     A Code 1 Response required them to follow Dispatch-provided turn-by-turn driving directions and obey all traffic laws.

74.      In addition, based upon their experience and training, including personally witnessing and investigating high-speed car collisions, issuing citations, and enforcing traffic laws

as part of their duties as Deputies, both Pelletier and Sacks personally knew the incredible and often fatal dangers reckless speeding and the disregard of traffic control signals by motorists posed to the public at large.

75.     With all of this actual, subjective knowledge, Deputy Pelletier deviated from the safest and most direct turn-by-turn driving directions provided by Dispatch, and with conscience shocking deliberate indifference to the safety of everyone on the road, raced the three (3) miles down New Road, reaching speeds of up to 82 mph, and never once obeyed the speed limit.

76.     Deputy Pelletier knew, and had every reason to know, as she raced the three (3) miles down New Road for nearly three (3) minutes, accelerating along the way to 82 mph, (37 mph over the limit) that she was violating both South Carolina law and CCSO Policy because: [9]

    a.  She was responding Code 1 to a non-emergency Stalled Vehicle;

    b.  She was legally required to obey the speed limit;

    c.  She had deviated from the main roads and driving directions assigned by Dispatch;

    d.  She was unfamiliar with the area and with New Road;

    e.  She knew New Road was poorly paved, dark, and unlit and that she was driving at night with poor visibility;

    f.  As she sped on New Road for several minutes, she became increasingly aware of its darkness, lack of lighting, and poor visibility;

    g.  She knew that she was not displaying her emergency lights nor using her audible sirens, thereby increasing the danger she knew she was posing to

_____

[9] Deputy Pelletier admitted her actual knowledge of many of these facts in her statements to the CCSO Investigating Officer:
-   Deputy Pelletier had never worked the south district and was unfamiliar with the area.
-   Deputy Pelletier was dispatched to a disabled vehicle located in a remote area of Highway 17 South.
-   Deputy Pelletier traveled on New Road, which is not illuminated by any streetlights or lights from businesses.
-   Deputy Sacks notified dispatch he was out with the disabled vehicle.
-   She was not utilizing her blue light and sirens while responding to the call. (*CCSO IA Report- Interview Excerpts*).

others on the road;

    h.   As she sped on New Road for several minutes, she knew she was coming ever closer to an intersection with Highway 17 where other vehicles would be traveling in cross-directions at speeds of 60 mph at that intersection;

    i.   As she sped on New Road for several minutes, she knew she would not have the right of way when she reached the Highway 17 intersection and would need to yield to other motorists in order to safely enter Highway 17; and

    j.   As she sped on New Road for several minutes, at some point she knew or should have known that Deputy Sacks had already reached the Stalled Vehicle.

77.    At any point in time on New Road, Deputy Pelletier could have and should have determined her exact GPS location and distance to Highway 17, as she had access to her own cell phone (Google Maps / Waze, etc) and/or MDT computer in her County Vehicle.

78.    At approximately 10:57 p.m. at a speed of approximately 82 mph, without switching on emergency lights or audible sirens, Defendant Pelletier sped past the Stop Sign on New Road, and crossed multiple lanes of traffic on Highway 17 (*MAIT scene photo below*):



79.    As Deputy Pelletier sped past a Stop Sign and through two lanes of Highway 17, she violently struck the vehicle driven southbound by Shanice Dantzler-Williams like a missile, at a speed of 73 mph, destroying the vehicle (The "Crash") *(SCHP scene photo below)*:



80.     Inside that vehicle, Shanice was the driver, her sister Miranda was a passenger, along with their mother Stephanie, who were all together for Mother's Day.

81.     Immediately prior to and at the moment of The Crash, Shanice was driving her vehicle lawfully in her lane of travel and below the speed limit.

82.     Given the speed at which Deputy Pelletier was driving her County vehicle without switching on her emergency lights or audible sirens, the lack of street lighting, the darkness at that time of night, and that Pelletier entered Highway 17 without the right-of-way from a poorly lit wooded side road on Shanice's left, it was not humanly possible for Shanice to avoid Deputy Pelletier's speeding County Vehicle prior to The Crash.

83.     Shanice was not at fault and in no way contributed to the cause of The Crash.

84.     Following the impact, Shanice's vehicle was launched westward into a wood line, striking a utility box, power pole guy wire, SCDOT signs, and trees.

85.     Deputy Pelletier's County vehicle rotated counterclockwise and finally came to a stop on the southbound shoulder of New Road.

86.     Stephanie, and her daughters, Shanice and Miranda, all sustained catastrophic injuries as a result of The Crash, suffered conscious pain and suffering, and then died shortly afterward.

### F. SCHP & CCSO POST-CRASH INVESTIGATIONS

87. South Carolina Highway Patrol ("SCHP") investigated the cause of The Crash and determined The Crash was caused solely by the unlawful driving of Deputy Pelletier.

88. SCHP also determined that Shanice was not at fault and in no way contributed to the cause of The Crash.

89. CCSO also investigated the cause of The Crash and determined The Crash was caused solely by the unlawful driving of Deputy Pelletier.

90. Neither the SCHP nor CCSO noted, commented, or inquired as part of their investigations as to the timing and the speed of Defendant Sacks in arriving at the non-emergency Stalled Vehicle.

91. Neither the SCHP nor CCSO noted, commented, or investigated the obvious fact that if the two Deputies left the same place at the same time, as Defendant Sacks stated, (and that the Deputy Driving Data showed in great detail), and if Defendant Pelletier was dangerously speeding along the way, exactly how did Defendant Sacks get to the Stalled Vehicle first?

92. Both Deputy Pelletier and Sacks, by their acts and omissions, knowingly, recklessly, and needlessly put the lives of all the people on the road that night at grave risk, including Shanice, Miranda and their mother Stephanie, all in violation of South Carolina law.

### G. CCSO's HISTORY OF DANGEROUS DEPUTY DRIVING, CRASHES, AND VIOLATIONS OF 14TH AMENDMENT RIGHTS

93. The Charleston County Sheriff's Office has a long and infamous history of dangerous and reckless driving by its Deputies that often involves the unlawful misuse and destruction of County Vehicles, that threatens public safety, and has resulted in numerous, recurrent violations of the 14th Amendment rights of those they injure and/or kill.

94. CCSO admits this history in its own Emergency Vehicle Operation and Driving

Lesson Plans wherein it states:

    a. The Charleston County Sheriff's Office was involved in 78 collisions in 2019 which they admit fault in over half of them; and

    b. In 2020, Charleston County Sheriff's Office was involved in at least 23 collisions and admitted fault in at least seven of the crashes.

    95.    The recent history of CCSO Deputies using County Vehicles and repeatedly causing vehicle crashes, especially those causing serious injury and death, is alarming. These are some of the recent, known crashes and their circumstances, based upon information and belief:

    a. On November 18, 2018, a CCSO Deputy was involved in a collision that resulted in the death of Megan Eichman. The subsequent lawsuit alleges that the Deputy was traveling in excess of 100 mph and without emergency lights or sirens when he collided with the decedent, Megan Eichman;

    b. On April 24, 2019, just six months after Eichman's death, another CCSO Deputy driving southbound on Savannah Highway at a high rate of speed (76 mph) at night collided with a motorist driving eastbound on Dobbin Road causing serious injury to a passenger as a result of the deputy's reckless speeding;

    c. On July 19, 2019 a bystander, Lane Lusk, was killed by a CCSO Deputy engaged in a chase. The pursuit quickly became dangerous and the fleeing vehicle ran two red lights and reached speeds of 109 MPH;

    d. On September 20, 2019, a CCSO Deputy lost control of her vehicle while clearly traveling at an excessive speed for conditions, struck a tree, resulting in her injury;

    e. On April 13, 2020, CCSO Deputy was driving in the far-right lane on Highway 17 when he made a sudden and illegal U-turn across the center lane of traffic and crashed into Kwamane Mitchell's vehicle, causing Mitchell's death. The deputy reportedly was not operating his emergency lights or equipment prior to initiating his turn or at the time of the collision;

    f. On April 19, 2020, a CCSO Deputy collided with a vehicle driven by a North Charleston Police Department officer near the intersection of Rivers Avenue and Cherokee Street, sending the North Charleston officer to the hospital;

    g. On May 21, 2020, a CCSO Deputy was speeding (74 mph) well above the posted limit on Old Towne Road when another driver traveling in the southbound lane attempted to make a left-hand turn. The Deputy failed to yield and crashed into them causing serious physical injuries and death. The Deputy was charged with reckless homicide and fired because of violations of department policies; and

h. On January 3, 2021, two people were killed when their vehicle was hit by a CCSO vehicle on Highway 17 near Bee Hive Road. The Deputy was traveling at an incredible 130 MPH and was later cited for driving too fast for conditions.

96.     Defendants Charleston County and CCSO certainly knew and know of each of these instances and every other involving County Vehicles furnished and entrusted to CCSO and its Deputies, as all claims related to damage to County Vehicles are handled through the Charleston County Safety & Risk Management Office, as well as many of these collisions have resulted in litigation.

97.     More importantly, as the above listing of crashes shows, Defendants Charleston County and CCSO had actual knowledge that their policies, customs, actions, and inactions were causing injuries, death, and violations of citizens' 14th Amendment rights of bodily integrity as well as possessed Deputy Driving Data to prove and establish each one, including every minute of dangerous driving and/or unlawful misuse that did into result in a crash.

98.     In October of 2020, the ongoing community safety problem of the dangerous driving and unlawful misuse of County Vehicles by Deputies, was made expressly known to CCSO and Charleston County. (*See Eichman v. Rissanen, CCSO and Town of James Island, USDC South Carolina – Charleston Division 2:20-cv-04057*).

H. CHARLESTON COUNTY & CCSO POLICIES, CUSTOMS, AND NEGLIGENT TRAINING, SUPERVISION, AND DISCIPLINE OF DEPUTIES TRAINING

99.     As the training records of Deputy Pelletier show, CCSO had and has custom and/or policy whereby Deputies while in field training (1) received grades of acceptable and were never rated unacceptable for their driving; and (2) didn't receive any further or ongoing monitoring, follow-up, or remedial training of any kind, regardless of any concerns raised by a Deputy's driving training.

100.     Per Charleston County and CCSO policy and/or custom, Deputies driving is not

supervised or monitored, and as such they do not receive any deputy specific training or retraining.

101.     CCSO and Charleston County had a policy whereby the Dash Cam Videos in County Vehicles furnished to CCSO and driven by Deputies were set at an outrageously high speed of 90 mph before they began to automatically record and thereby encouraged Deputies to drive at speeds of 89 mph to escape video capture of any of their dangerous driving and/or unlawful misuse of County Vehicles.

102.     As set forth, *supra*, the existence of all Deputy Driving Data, that includes, at times, Dash Cam Video, meant that every act of dangerous driving and/or unlawful misuse of County Vehicles by Deputies, including those Deputies engaged in reckless and unlawful speeding, as well as those Deputies deviating from the turn-by-turn driving directions provided by Dispatch, was at all times captured, known, and easily reviewable by the County, CCSO and/or their respective policymakers.

103.     Despite having Deputy Driving Data, per Charleston County and CCSO policy and custom, neither Defendant engaged in any review of Deputy Driving Data to prevent, monitor, identify, retrain, and/or discipline Deputies for any dangerous driving and/or unlawful misuse of County Vehicles so as to prevent and deter same.

104.     Even when a Deputy is involved in a collision, per Charleston County and CCSO policy and custom, neither Defendant completely reviews all Deputy Driving Data of that Deputy, or those deputies related to that collision, as was shown in the limited investigation into The Crash.

105.     Per Charleston County and CCSO policy and custom, even when a Deputy was involved in a collision and their driving was subject to review, many Deputies were not even disciplined for blatant violations of CCSO policy and/or State Law and instead, routinely received "Letters of Instruction" from only CCSO.

106.    Per Charleston County and CCSO policy and custom, these "Letters of Instruction" were only given after a Deputy was (a) involved in a crash resulting in damage to their County Vehicle, or (b) when an official complaint was made by the public, and are not issued otherwise as to any Deputy Driving.

107.    And even when a Deputy received a Letter of Instruction informing them that they have violated a CCSO policy and/or State law, **the Letter clearly stated it is was not disciplinary in nature and that it only served as notice to the Deputy**. (*See Excerpt Below*)

> This Letter of Instruction is not disciplinary in nature; however, it is my opinion this letter will reinforce the need to review the above policy to prevent future violations. The above incident will be documented in your monthly chronological.

108.    These non-disciplinary Letters of Instruction had been issued by CCSO to Deputies for policy violations as severe as:

     a.  Being at fault for collisions with members of the community;

     b.  Repeatedly hitting private property with a County Vehicle and causing damage;

     c.  Ignoring traffic signs and lights when not responding to an emergency;

     d.  Failing to inform CCSO that their drivers' license had been suspended;

     e.  Speeding, losing control of their county vehicle, and almost hitting a child; and

     f.  Speeding in excess of 100 MPH and losing control of their vehicle, resulting in a crash with a member of the public.

I.    CHARLESTON COUNTY HAS ABANDONED ITS DUTY TO SUPERVISE, INVESTIGATE, TRAIN, AND DISCIPLINE DEPUTIES FOR THEIR DRIVING

109.    The Safety & Risk Management Office of Charleston County has the responsibility to train all County employees in general safety awareness, that includes defensive driving.

110.    The Safety & Risk Management Office fulfills this responsibility, in part, by conducting monthly Vehicle Collision Review Board meetings.

111.    The purpose of the VCRB is to supervise, investigate, and discipline County

employees who are involved in a collision with their County Vehicles.

112.    The VCRB can even suspend and/or revoke the driving privileges of a County employee.

113.    Per CCSO and Charleston County Policy, CCSO Deputies who are involved in a collision are likewise subject to the supervision, investigation, and discipline by the VCRB and must participate in the VCRB process. *(See Charleston County Sheriff's Office Policy and Procedure 1-08)* excerpt set forth below:

C.    Sheriff's Office personnel must review and abide by the Charleston County Vehicle Collision Review Board (VCRB) policy.

Y.    Vehicle Collision Review Board (VCRB):

    1.    Every operator of a Sheriff's Office fleet vehicle or special purpose vehicle will adhere to the Charleston County Government Vehicle Collision Review Board (VCRB) policy.

    2.    Operators of Sheriff's Office fleet vehicles involved in an accident will attend the VCRB unless notified otherwise by the Charleston County Safety and Risk Management Office.

    3.    Employees cleared from accident liability by the VCRB will not incur further internal agency sanction or inquiry unless the accident is connected to an internal administrative investigation.

    4.    Employees found liable for chargeable accidents by the VCRB must attend the first available Defensive Driving Course. Supervisors will be responsible to coordinate and schedule this training, with the Charleston County Safety and Risk Management Office, upon notification of adjudicated points against an employee by the VCRB.

    5.    Employees who lose their County driving privileges and incur internal discipline will have their case handled in a fair and equitable manner that reflects the best interest of the Sheriff's Office and the employee.

114.    The Charleston County Safety & Risk Management Office has exclusive control of whether or not a Deputy avoids the supervision, investigation, and/or discipline by the VCRB for a collision.

115.    Upon information and belief, there is a custom and/or policy by Charleston County and its Safety & Risk Management Office to completely abandon and refuse to ever investigate, supervise, and/or discipline any CCSO Deputies, or have them subject to the VCRB process, for their collisions involving County Vehicles despite knowing:

    a.    the number, frequency, severity, circumstances, and degree of fault of each and every collision involving a Deputy driving a County Vehicle as all claims are handled through the Charleston County Safety & Risk Management Office; and

    b.    every minute of dangerous driving and/or unlawful misuse of County vehicles by Deputies in their Deputy Driving Data that is captured and readily accessible; and

    c.    knows that the CCSO does not discipline any Deputy for their driving as no Deputy ever attends the Defensive Driving Course required by the VCRB for a County employee who is at fault in a collision;

116.    Upon information and belief, despite the above written policy, and the Charleston County's knowledge of every Deputy collision and all the Deputy Driving Data, there have been no instances where Defendant Charleston County, thru the VCRB or otherwise, has reviewed any Deputy Driving, reviewed any Deputy Driving Data, nor disciplined any Deputy in any manner for a collision involving a County Vehicle despite having the express authority and obligation to do so.

117.    As a result of County and CCSO policy and custom, Deputies knew and know that so long as they were not involved in a collision, and many times, even if they were, their dangerous driving and/or unlawful misuse of County Vehicles, even if proven in their Deputy Driving Data, would never be reviewed and/or likely be the subject of any discipline.

## J.  CONDONATION

118.    As set forth *supra*, there exists in both the CCSO and Charleston County a tacit and express acceptance of dangerous driving and unlawful misuse of County Vehicles by Deputies despite knowledge that dangerous and unlawful Deputy Driving of County Vehicles has caused

and is causing collisions and recurring violations of the 14th Amendment rights of those who are the victims of their driving.

119.    Direct proof of CCSO's express condonation of unlawful behavior is shown in CCSO's own Letter of Suspension to Sacks where his unlawful driving at up to 80 mph was "not concerning due to the roadway you were on.": (*Excerpt - Sacks Letter of Suspension*)

> There are several videos of you in-car camera activating due to going over 80 mph.  While some are not concerning due to the roadway you were on and that you did not go over 80 mph, others

120.    Defendant CCSO's condonation of this unlawful behavior shows how supervisors at CCSO view instances of dangerous, unlawful driving, even when captured on video.

121.    Further, as the documentation of the Deputy Sacks review shows, only his Dash Cam Video was reviewed and none of his other Deputy Driving Data that would show the frequency and severity of his less than 80-90 mph dangerous driving and/or unlawful misuse of his County Vehicle, such as, hypothetically, if his vehicle was operated at 79 mph in a 25 mph zone in response to a non-emergency.[10]

122.    As set forth *supra*, Charleston County via the Safety and Risk Management Office has completely abandoned any and all oversight of Deputy Driving, even those that cause injury and/or death.

123.    Despite this extensive history and knowledge of dangerous Deputy driving, set forth above, there has been a complete absence of any review of any Deputy Driving Data; any meaningful monitoring, supervision, disciplining, reporting, re-training and/or investigation of Deputies and their dangerous driving and/or unlawful misuse of County Vehicles by either CCSO and/or Charleston County so as to ratify and condone their behavior despite knowing that said

---

[10] Sometime after The Crash, CCSO lowered the automatic Dash Cam Recording speed of County Vehicles driven by Deputies from 90 mph to 80 mph.

Deputies are causing injuries and death and violations of citizens' 14th Amendment rights of bodily integrity.

124.    The policies, customs, and negligent training, supervision, and discipline by Charleston County & CCSO of Deputies as of May 8, 2022, set forth *supra* and *infra*, created a culture of dangerous driving and unlawful misuse of County Vehicles by Deputies as Deputies knew that there was (a) an absence of supervision; (b) an absence of any discipline or consequences; and (c) tacit and/or express approval and acceptance of any and all of their dangerous driving and/or unlawful misuse of County Vehicles, and as such, made it likely and foreseeable to CCSO and/or Charleston County and their policymakers that people on the road with Deputies would suffer injuries, death, and 14th Amendment rights violations from the ongoing and future dangerous driving and/or unlawful misuse of County Vehicles by CCSO Deputies, including Shanice, Miranda and Stephanie.

125.    As a direct and proximate result of any one or more of the acts and/or omissions of any one or more of the Defendants as alleged herein, Shanice, Miranda, and Stephanie all suffered catastrophic injuries with conscious pain and suffering that ultimately resulted in their deaths.

## FOR A FIRST CAUSE OF ACTION
### (Negligence/ *Negligence Per Se* – All Defendants)

126.    All allegations made in the preceding paragraphs are re-alleged as if fully set forth herein.

127.    Defendant Pelletier was negligent, careless, reckless, grossly negligent and wanton, and proximately caused The Crash, the injuries, and the death of Shanice, Miranda and Stephanie in any one or more of the following respects:

    a. Exceeded the posted speed limits, disregarded traffic signals, and endangered life and property in violation of *S.C. Code Ann. §56-5-760 Operation of authorized emergency vehicles;*

b. Violated numerous traffic laws as set forth in *S.C. Code Ann. §§ 56-5-10 et seq*;

c. Failed to operate her vehicle in a lawful manner with due care for public safety;

d. Failed to maintain control of her vehicle;

e. Failed to keep a proper lookout while operating her vehicle;

f. Failed to direct Defendant Sacks to follow the law and CCSO policy;

g. Failed to exercise the degree of care that a reasonable person would have exercised under the same or similar circumstances; and

h. In such other and further particulars as the evidence and/or trial may show.

128.     Defendant Sacks was negligent, careless, reckless, grossly negligent, and wanton and proximately caused The Crash, injuries and death of Shanice, Miranda and Stephanie in any one or more of the following respects:

a. Exceeded the posted speed limits and endangered life and property in violation of *S.C. Code Ann. §56-5-760 Operation of authorized emergency vehicles;*

b. Violated numerous traffic laws as set forth in *S.C. Code Ann. §§ 56-5-10 et seq*;

c. Failed to operate his vehicle in a lawful manner with due care for public safety;

d. Failed to direct Defendant Pelletier to follow the law and CCSO policy especially as he was the more senior Deputy;

e. As the more senior Deputy, aided and abetted Deputy Pelletier's tortious conduct by his example and acting in concert through substantial assistance and encouragement by his own dangerous tortious conduct;

f. Substantially encouraged the negligent and dangerous actions of Deputy Pelletier;

g. Failed to exercise the degree of care that a reasonable person would have exercised under the same or similar circumstances; and

h. In such other and further particulars as the evidence and/or trial may show.

129.     Defendant CCSO and/or Charleston County are vicariously liable for the negligent, careless, reckless, grossly negligent, and wanton acts and omissions of Defendants Pelletier and Sacks.

130.      Defendant Charleston County, by and through the acts and omissions of its employees, was negligent, careless, reckless, grossly negligent and wanton and is liable for the injuries and death of Shanice, Miranda, and Stephanie in any one or more of the following respects:

   a. Failed to exercise reasonable care to monitor, supervise, create and enforce policies, including discipline of Deputies for their driving via the VCRB, as well as investigate, prevent and end the ongoing dangerous driving and unlawful misuse by the CCSO and its Deputies of County Vehicles given the actual knowledge of the extensive history of crashes involving CCSO Deputies, litigation, and the Deputy Driving Data that is known to exist by Charleston County and is readily and easily accessible;

   b. Failed to exercise the degree of care that a reasonable person would have exercised under the same or similar circumstances; and

   c. In such other and further particulars as the evidence and/or trial may show.

131.      As a direct and proximate result of any one or more of the acts and/or omissions of any one or more of the Defendants as alleged herein, Shanice, Miranda and Stephanie all suffered catastrophic injuries with conscious pain and suffering that ultimately resulted in their deaths.

### FOR A SECOND CAUSE OF ACTION
### (Negligent Training – CCSO of Pelletier & Sacks)

132.      All allegations made in the preceding paragraphs are re-alleged as if fully set forth herein.

133.      Defendant CCSO knew or should have known that its failure to provide adequate training to and supervision of the Deputies of the CCSO, including Defendants Sacks and Pelletier, would and could result in serious injury and/or death.

134.      Defendant CCSO breached their duties by their policies, customs, and failure to reasonably train Deputies Sacks and Pelletier, as set forth *supra,* who committed the acts and omissions described in this Complaint.

135.      As a direct and proximate result of any one or more of the acts and/or omissions

of any one or more of the Defendants as alleged herein, Shanice, Miranda, and Stephanie all suffered catastrophic injuries with conscious pain and suffering that ultimately resulted in their deaths.

### FOR A THIRD CAUSE OF ACTION
**(Negligent Supervision by CCSO & Charleston County of Sacks & Pelletier)**

136.    All allegations made in the preceding paragraphs are re-alleged as if fully set forth herein.

137.    Defendant CCSO and Charleston County owed a duty to exercise reasonable care to monitor, supervise, create, and enforce policies, as well as investigate and discipline the dangerous, wrongful, and/or unlawful conduct of its Deputies operating County Vehicles, including Deputies Pelletier and Sacks, to determine if these persons were safe and appropriate drivers on the road, especially given the vast amount of time spent driving as well as the lethality of a County Vehicle.

138.    Despite the extensive history of crashes involving County Vehicles by CCSO Deputies, the Deputy Driving Data captured by Dispatch related to the driving of County Vehicles by each and every Deputy that is known to exist by CCSO and Charleston County, that is readily and easily accessible to same, lawsuits involving this very issue with ongoing litigation over the last two years, there has been a complete absence of any review of Deputy Driving Data, monitoring, supervision, disciplining and/or investigation of Deputies and their driving, including Defendants Pelletier and Sacks, prior to injuring or killing others on the road, and even then, the after-the-fact investigations were limited solely to the crash itself.

139.    Further, this absence of supervision extends to Charleston County and CCSO policy whereby the Dash Cam Video cameras in County Vehicles would not automatically record the driving of any Deputy unless and until a County Vehicle exceeded an incredible 90 mph,

thereby encouraging unlawful speeding up to 89 mph and prevented video evidence of these violations of South Carolina law and CCSO policy by Deputies from being captured.

140.    Further Charleston County completely abandoned and failed to exercise any care to monitor, supervise, create and enforce policies, including discipline of Deputies via the VCRB as alleged *supra.*

141.    Specifically, especially as to Defendant Pelletier, CCSO and Charleston County owed a duty to monitor and supervise her with even greater scrutiny as she had a recent conviction of speeding roughly one year before being hired, had never worked previously as a law enforcement officer, was only recently hired on 4/23/21 and had a well-documented series of safety problems and difficulties in her training, *see supra,* before causing The Crash.

142.    Once Defendant CCSO finally looked into the behavior of Defendant Sacks, they discovered during the period of January 2023, he routinely committed acts of dangerous driving and unlawful misuse of County Vehicles where his actions put the public at risk and described his safety as "reprehensible" and stated "It is apparent you lack professionalism, care, and competency to adequately do your job."

143.    Defendants Charleston County and CCSO breached their duty by failing to supervise Deputies Pelletier and Sacks, who committed the acts and omissions described in this Complaint.

144.    As a direct and proximate result of any one or more of the acts and/or omissions of any one or more of the Defendants as alleged herein, Shanice, Miranda, and Stephanie all suffered catastrophic injuries with conscious pain and suffering that ultimately resulted in their deaths.

**FOR A FOURTH CAUSE OF ACTION**
**(42 U.S.C § 1983 – Civil Rights Violation by Defendants Pelletier and Sacks)**

145.    All allegations made in the preceding paragraphs are re-alleged as if fully set forth

herein.

146.     The acts and omissions of Defendants Pelletier and Sacks, by knowingly driving their County Vehicles in violation of South Carolina law, County Ordinances, and CCSO policy, at such extreme and outrageous speeds, without switching on their emergency lights or audible sirens, while racing to a non-emergency Stalled Vehicle call, constituted a conscience-shocking deliberate indifference to the lives and safety of those on the road that evening, including Shanice, Miranda, and their mother, Stephanie.

147.     Specifically, Defendants Pelletier and Sacks subjectively knew and had full knowledge of the substantial risk of harm their dangerous driving and unlawful misuse of their County Vehicles posed to the public as they:

    a. Had over 10 minutes from when first dispatched until The Crash to deliberate their conduct—to slow down, encourage each other to slow down, apply their knowledge and training to the situation, reflect on their actions, and conform their behavior to lawful behavior;

    b. Knew they were not responding to any emergency;

    c. Knew the law (and department policy) that required them to drive the speed limit and obey all traffic laws;

    d. Continued to drive at incredibly excessive and dangerous speeds, especially Pelletier's conscience-shocking 81 mph — nearly forty miles per hour over the 45-mph speed limit—on a dark, wooded road with full knowledge of the risks of night driving as she was approaching a busy Highway 17, as well as her failure to determine her exact location and to stop at a Stop sign before crossing multiple lanes of a busy highway; and

    e. Both knew that driving without switching on their emergency lights and audible sirens, especially at night, only increased the danger to everyone on the road, as it eliminated any audible or visual warning to other drivers that their vehicles were approaching at a high rate of speed.

148.     At all times material to this Complaint, and as alleged *supra*, Defendants Pelletier and Sacks acted with recklessness and deliberate indifference constituting a conscious disregard to the clearly established Fourteenth Amendment substantive due process rights of Shanice, Miranda, and their mother, Stephanie, including those of their heirs and statutory beneficiaries in

their familial relationships with the decedents:

    a. to be free from deliberately indifferent and conscious shocking government behavior; and

    b. to be free of the loss of bodily integrity and property.

149.    As a direct and proximate cause of the acts and omissions as alleged *supra,* Defendants Pelletier and Sacks violated 42 U.S.C. § 1983, and acted with deliberate indifference constituting a conscious disregard to the clearly established Fourteenth Amendment rights of Shanice, Miranda, and their mother, Stephanie, that resulted in their injury and death.

### 42 U.S.C. § 1983 *Monell* LIABILITY ALLEGATIONS

150.    All allegations made in the preceding paragraphs are re-alleged as if fully set forth herein.

151.    Charleston County is an entity subject to suit pursuant to 42 U.S.C. § 1983.

152.    In regard to the claims set forth herein, CCSO is also an entity subject to suit pursuant to 42 U.S.C. § 1983.

### A. HISTORY & LAW ENFORCEMENT AUTHORITY – CHARLESTON COUNTY & CCSO

153.    From 1937 to 1990, County law enforcement within the unincorporated areas of Charleston County was vested in the officers of the Charleston County Police Department ("CCPD").

154.    During this period, the CCPD was a department within the Charleston County political subdivision.

155.    During this period, same as every other department within the Charleston County political subdivision, CCPD was entirely budgeted by Charleston County Council and funded entirely by the tax collections and revenues of Charleston County.

156.    The CCPD also had a Police Chief and officers who were all employees of

Charleston County.

157.    The CCPD, then, like the CCSO today, was responsible for County law enforcement within unincorporated Charleston County.

158.    At that time, there was also a Charleston County Sheriff, elected by the citizens of Charleston County, who oversaw the jail, courthouse security, and delinquent tax collections pursuant to South Carolina law.

159.    During this period, same as every other department within the Charleston County political subdivision, the CCSO was entirely budgeted by Charleston County Council and funded entirely by the tax collections and revenues of Charleston County.

160.    In 1991, Charleston County Council voted to transfer the County law enforcement power of the then CCPD into the Charleston County Sheriff's Office.[11]

161.    Following that vote, all CCPD officers in essence "changed uniforms" and became CCSO Deputies with both the same County law enforcement authority from Charleston County as they had before when they were CCPD officers but gained additional powers as Deputies.

162.    As that 1991 Council vote and ordinance established, the authority of Charleston County Deputies to conduct County law enforcement activities in the County of Charleston, for the benefit of Charleston County, was vested in part in the County itself through its County Council.

163.    Since 1991, Charleston County Deputies, including Deputies Pelletier & Sacks continue to operate and exercise authority granted by Charleston County pursuant to its 1991 vote.

164.    County Council could just as easily vote tomorrow to remove this County law

---

[11]  Section 7 of Ordinance No. 794, adopted December 18, 1990, provided for the following: "That Charleston County Council hereby abolishes the Charleston County Police Department, and devolves and transfers all such duties and powers upon the Charleston County Sheriff's Department, effective January 1, 1991."

enforcement authority granted to the Sheriff, CCSO, and its Deputies, and reinstate the Charleston County Police Department.

B.  FINANCES, FUNDING & STRUCTURE OF CHARLESTON COUNTY AND CCSO

165.    Charleston County is financially and operationally structured as single political subdivision with departments within for the purposes of budgeting and accounting.

166.    The 2022 Budget of Charleston County and its Financial Reports are incorporated in their entirety as if set forth herein by reference. [12] [13]

167.    CCSO's operations are funded exclusively by the tax collections and revenues of Charleston County as is shown in 2022 Fiscal Year Financial Report of Charleston County.

168.    Charleston County is not funded by revenues from the State of South Carolina.

169.    From these County revenues, Charleston County separately budgets and funds each department, as each department lacks the authority to levy taxes or establish their own budget (*See excerpt of 2022 Charleston County Budget showing funding of Departments below)*

| Organization | General Fund | Debt Service Fund | Special Revenue Funds | Enterprise Funds | Internal Service Funds | Total |
|---|---|---|---|---|---|---|
| County Council | 2,160,419 | | | | | 2,160,419 |
| Accommodations Tax: Local | | | 15,485,694 | | | 15,485,694 |
| Accommodations Tax: State | | | 452,504 | | | 452,504 |
| Alr Service Development | | | 9,332,500 | | | 9,332,500 |
| Administrator | 1,125,688 | | | | | 1,125,688 |
| Assessor | 4,917,985 | | | | | 4,917,985 |
| Auditor | 2,659,236 | | | | | 2,659,236 |
| Awendaw McClellanville Fire | | | 2,825,947 | | | 2,825,947 |
| Budget | 837,387 | | | | | 837,387 |
| Building Inspections Services | | | | | | 2,545,073 |
| Clerk of Court | 4,674,749 | | 1,430,000 | | | 6,104,749 |
| Community Development | 1,636,120 | | | | | 1,636,120 |
| Community Revitalization & Housing Affa | 484,696 | | | | | 484,696 |
| Consolidated Dispatch | 9,593,141 | | | 4,655,330 | | 14,248,471 |
| Contracts and Procurement | 1,418,180 | | | | 3,000,000 | 4,418,180 |
| Coroner | 2,986,136 | | | | | 2,986,136 |
| DAODAS | | | 11,801,766 | | | 11,801,766 |
| Deputy Admin Community Services | 442,057 | | | | | 442,057 |
| Deputy Admin Finance | 820,436 | | | | | 820,436 |
| Deputy Admin General Services | 726,062 | | | | | 726,062 |
| Deputy Admin Public Safety | 769,769 | | | | | 769,769 |
| Deputy Admin Transportation | 470,247 | | | | | 470,247 |
| Economic Development | | | 41,674,922 | | | 41,674,922 |
| Elections/Voter Registration | 2,346,503 | | | | | 2,346,503 |
| Emergency Management | 1,150,768 | | 222,418 | | | 1,373,184 |
| Emergency Medical Services | 20,223,026 | | | | | 20,223,026 |
| Environmental Management | | | | 40,159,658 | | 40,159,658 |
| Facilities Management | 21,007,301 | | | 3,399,105 | 2,288,653 | 26,700,059 |
| Finance | 1,115,759 | | | | | 1,115,759 |
| Fire Districts | | | 914,055 | | | 914,055 |
| Fleet Operations | | | | | 16,562,716 | 16,562,716 |
| Greenbelt Programs | 28,530 | | 19,622,914 | | | 19,651,544 |
| Human Resources | 2,822,176 | | 60,000 | | 31,459,385 | 34,341,561 |
| Internal Auditor | 353,450 | | | | | 353,450 |
| Legal | 1,773,502 | | 87,400 | | | 1,860,902 |
| Legislative Delegation | 419,953 | | | | | 419,953 |
| Library | 25,913,679 | | | | | 25,913,679 |
| Magistrate Courts | 5,451,426 | | 392,442 | | | 5,843,868 |
| Master-In-Equity | 764,596 | | | | | 764,596 |
| Nondepartmental | 21,373,557 | 33,288,635 | | | | 54,662,192 |
| Planning and Zoning | 2,137,848 | | 250,000 | | | 2,387,848 |
| Probate Courts | 3,266,010 | | | | | 3,266,010 |
| Public Defender | 3,653,007 | | 7,113,857 | | | 10,766,864 |
| Public Works | 17,354,787 | | 101,674,022 | | | 119,028,809 |
| Register of Deeds | 2,863,663 | | | | | 2,863,663 |
| Revenue Collections | 1,029,285 | | | 2,366,898 | | 3,396,183 |
| Safety & Risk Management | 3,302,926 | | | | 5,761,960 | 9,154,708 |
| Sheriff | 81,050,280 | | 1,159,694 | | | 82,209,974 |
| Solicitor | 7,312,076 | | 2,906,715 | | | 10,220,793 |
| State Agencies | 329,859 | | | | | 329,859 |
| Technology Services | 15,635,629 | | | 4,655,935 | 2,152,030 | 22,313,794 |
| Treasurer | 2,227,121 | | 32,414,000 | | | 32,414,000 |
| Trident Technical College | | | | | | 2,227,121 |
| Transit Agencies | | | 11,646,879 | | | 11,646,879 |
| Veterans Affairs | 429,734 | | | | | 429,734 |
| **Total Disbursements** | 271,832,344 | 33,288,635 | 245,267,704 | 66,040,691 | 61,226,697 | 678,336,061 |

---

[12]  See Charleston County FY 2022 Budget:
https://www.charlestoncounty.org/departments/budget/files/FY22-Approved-Budget.pdf
[13] See, Charleston County FY 2022 Report:
https://www.charlestoncounty.org/departments/finance/FY22ACFRIndex.php

170.    The CCSO is a department within Charleston County and lacks the authority to levy taxes or establish their own budget.

171.    In 2022, Charleston County budgeted, funded, and expended roughly $76.6 million dollars appropriated to the operations of the CCSO.

172.    This budgeting and funding is the same as is done for the roughly 40 or so other departments of the County ranging from County Council to the Assessor to Public Works.

173.    CCSO holds no title to any land, property, buildings, vehicles, bank accounts, or otherwise, and all assets used by CCSO are titled, owned, and furnished by Charleston County, the same as every other Charleston County Department.

174.    When CCSO engages in tax collections for Charleston County, it is required by law to deposit any funds received into the general fund of the County.

175.    Charleston County funds and pays for all expenses and liabilities incurred by CCSO operations and all expenses related to the administration of its offices, the same as every other Charleston County Department.

176.    In 2022, and at all times relevant to this Complaint, Deputies are paid by Charleston County, just the same as all other County employees and their predecessors - the police officers of the CCPD.

177.    As set forth *supra,* Charleston County, also insures and indemnifies CCSO and its Deputies for the benefit of Charleston County, as part of the business of Charleston County, the same as it does every other employee and Department of Charleston County.[14]

---

[14] See e.g. 2021 settlement of Jamal Sutherland Torts Claims Act and civil rights claims whereby Charleston County Deputies tased Sutherland who died. The $10 million settlement was paid; $1 million by IRF on behalf of Charleston County; $1 million by the IRF on behalf of the City of North Charleston; and $8 million by Charleston County from its treasury.

178.    The duty of Charleston County to fund, insure, and indemnify CCSO, includes Charleston County's statutory obligation to furnish CCSO with items necessary to the proper transaction of the legitimate business of the CCSO, that includes, since 1991, funding for County law enforcement previously paid to the CCPD.

179.    Charleston County funds, insures, and indemnifies CCSO and its Deputies, as employees of Charleston County, via the purchase of two liability insurance policies:

    a. A policy covering all County Vehicles, that includes the County Vehicles used by CCSO and its Deputies, including the County Vehicles driven by Deputies Sacks and Pelletier ("County Automobile Policy") and;

    b. A policy covering the general tort liability of all Charleston County employees, including Deputies ("County Tort Policy").

180.    CCSO purchases no insurance itself in its own name as it has no funds to expend, owns nothing, employs no one, and has no "insurable interest" in any County property or County Vehicles.

181.    At no time, and under no circumstance, are funds from the Treasury of the State of South Carolina at risk for the acts or omissions of Charleston Counties Deputies and/or the CCSO and/or any other Charleston County employee.

C.  THE INSURANCE RESERVE FUND – NO STATE OF SOUTH CAROLINA FUNDS AT RISK

182.    In 2022, Charleston County elected to use the Insurance Reserve Fund ("IRF") to purchase its County Automobile Policy and County Tort Policy.

183.    Charleston County could have purchased its County Automobile Policy and County Tort Policy from any insurer and is and was under no legal obligation to use the IRF.

184.    The IRF is a division of the South Carolina State Fiscal Accountability Authority.[15]

_____

[15] General information relating to the authority and operations of the IRF is incorporated by

185.     The Insurance Reserve Fund Audited Financial Report for the Fiscal Year Ended June 30, 2022 is incorporated herein in full by reference and explains the IRF's funding, operations, and finances in great detail. (*See Exhibit E – 2022 IRF Audited Financial Statements.*)

186.     **The IRF is a self-insurance mechanism** as stated in the 2022 IRF Audited Financial statements: (emphasis added)

> "In many respects, the IRF functions in the same way as an insurance company. The IRF issues policies, collects premiums, pays losses, and purchases reinsurance against swings in experience or catastrophic losses. As an insurance operation, the IRF files a National Association of Insurance Commissioners Annual Statement each year with and is subject to periodic audits by the South Carolina Department of Insurance. The IRF does not market its services or pay marketing costs. Also, the IRF does not pay taxes or participate in any Guaranty Fund or Pool. As a self-insurance mechanism, the IRF is responsible for funding fortuitous losses experienced by governmental entities in South Carolina and offers very broad and, in some cases, unique coverage for its insureds." *Id.* at p.8

187.     The IRF does not receive any appropriations from the General Fund of the State of South Carolina and its sole source of revenue is premiums collected *Id.* at p.7

|  | 2022 | 2021 |
|---|---|---|
| Operating revenues: |  |  |
| Insurance premiums | $   193,195,978 | $   188,869,583 |
| Operating revenues | 193,195,978 | 188,869,583 |

188.     All premiums received by the IRF are deposited in the IRF Trust Account with the Office of the State Treasurer where the funds are then invested and maintained separately from any other State funds. [16] *Id.* at p.9 *(See also excerpt below from IRF website):*

> All premiums received by the Insurance Reserve Fund are deposited with the Office of the State treasurer where the funds are maintained as the Insurance Reserve Fund Trust Account. By statutory requirement, these funds are to be used to pay claims and operating expenses of the Insurance Reserve Fund. The Office of the State Treasurer is responsible for investing these funds.

reference in full.  https://www.irf.sc.gov/about_us
[16] As of June 30, 2022, the IRF had $198,000,000 available to pay claims, including the claims of Plaintiffs' arising from The Crash of May 8, 2022.

189.    As such, no funds of the State of South Carolina Treasury are put into the IRF Trust Account.

190.    The IRF pays claims incurred under its policies solely from premiums collected, investment returns on those premiums, and the purchase of private reinsurance as it set forth in its 2022 audited financial statements: *Id.* At p.14

The Fund collects premiums from participating entities, issues policies, and pays claims incurred under the policies from accumulated premiums and earnings on investments and notes receivable.

191.    As is plainly shown in the audited financial statements, **when a claim is made against any governmental entity insured by the IRF, and the IRF pays that claim, no funds of the State Treasury of South Carolina are at risk or used to fund or pay any part of that claim.** (emphasis added)

D.  COUNTY AUTOMOBILE INSURER: AMERICAN SOUTHERN (NYSE: AAME)

192.    Charleston County purchases County Automobile Liability Insurance Policy from the IRF, but the IRF is not the actual insurer of the risk.

193.    Pursuant to S.C. Code § 1-11-147, the IRF elected to contract and purchase private insurance (reinsurance) to insure the liability and risks of the County Automobile Policy and all government vehicle policies the IRF contracted for.

194.    In December 2021, the IRF solicited public bids for this reinsurance from private insurance companies as is set forth below in this excerpt of the published Invitation for Bid.



| **State of South Carolina** | Solicitation:<br>Date Issued:<br>Procurement Officer:<br>Phone:<br>E-Mail Address:<br>Mailing Address: | **5400022450**<br>12/02/2021<br>NATHAN DAWSON<br>(903) 737-9931<br>ndawson@mmo.sc.gov<br>SFAA, Div. of Procurement Services<br>1201 Main Street, Suite 600<br>Columbia SC 29201 |
| Invitation For Bid | | |

DESCRIPTION: **Auto Liability Reinsurance**

USING GOVERNMENTAL UNIT: **Insurance Reserve Fund**

195.     As is set forth in the Invitation for Bid, the purpose of the reinsurance contract to be purchased by the IRF from the winning reinsurer was to relieve the IRF of any and all financial liability for all the government automobile policies the IRF issued. (excerpt below)

**I. SCOPE OF SOLICITATION**

**ACQUIRE SERVICES (MODIFIED)**

The State Fiscal Accountability Authority, Division of Procurement Services, Office of State Procurement, on behalf of the South Carolina Insurance Reserve Fund (IRF) is soliciting bids from qualified applicants to establish a contract in accordance with §1-11-147 of the SC Code of Laws. This contract will provide the IRF with 100% reinsurance on the automobile policies issued by the IRF. Such an arrangement is not subject to South Carolina Premium Tax. In all other respects, the successful bidder will function as a direct insurer and will provide claims, engineering, and reporting services as specified in this document, and will commit all necessary information technology resources in order to provide for the transmission of data between themselves and the IRF.

196.     For 5/1/22 – 4/30/25 the IRF awarded the reinsurance contract to American Southern and thereafter paid and pays American Southern $5,681,930.25 quarterly from the premiums the IRF collects to insure all the governmental automobile policies issued by the IRF. *See Exhibit F – Contract Award - IRF and American Southern.*

**Contract Number:** 4400028446
**Awarded To:**     AMERICAN SOUTHERN INSURANCE COMPANY (7000151183)
                3715 NORTHSIDE PARKWAY SUITE 400 - 800
                ATLANTA GA 30327

**Total Potential Value:**     $ 68,183,163.00
**Maximum Contract Period:** May 01, 2022 through April 30, 2025

| Item | Description | Unit Price | Annual Price |
|------|-------------|------------|--------------|
| 00001 | Estimated Quarterly Premium | $ 5,681,930.25 | $ 22,727,721.00 |

197.     American Southern Insurance, is a subsidiary of Atlantic American Corporation,

a publicly traded company (NYSE symbol: AAME) as is described in detail in the 2022 10K Annual Report of AAME.[17]

198.    The reinsurance contract between the IRF and American Southern means that the County Vehicles driven by Pelletier and Sacks as alleged herein, is and was insured by American Southern who is the actual insurer and is the party responsible for the County Automobile Policy risk.

199.    Pursuant to the IRF - American Southern reinsurance contract, American Southern, a publicly traded company, is the entity that actually adjusts and pays any claims made against the Charleston County Automobile Policy for collisions and claims against Deputies arising from their use of County Vehicles, including those of the Plaintiffs' alleged herein.

E.    COUNTY TORT LIABILITY INSURANCE POLICY – NO STATE FUNDS AT RISK

200.    As stated *supra*, by the IRF itself, and its auditors, the IRF derives all revenues solely from premiums collected and receives no funding from the State of South Carolina.

201.    The IRF functions in all respects as a private insurer – collecting premiums, investing same, purchasing reinsurance, adjusting claims, and paying out on claims all from premiums collected and invested.

202.    As such, at no time, and under no circumstance, is the State of South Carolina liable for the claims of Plaintiffs including as to the County Automobile Policy and/or County Tort Policy purchased by the County from the IRF.

203.    As such, at no time, and under no circumstance, are any funds from the Treasury

---

[17] American Southern provides tailored business automobile insurance coverage, on a multi-year contract basis, to state governments, local municipalities and other large motor pools and fleets ("block accounts") that can be specifically rated and underwritten. (2022 Annual Report Atlantic American Corporation). https://atlam.gcs-web.com/static-files/e1eff466-ae4d-4fab-8504-266abebfbdae

of the State of South Carolina at risk for the claims of Plaintiffs including as to the County

Automobile Policy and/or County Tort Liability Policy purchased by the County from the IRF that

has coverage for the claims of Plaintiffs.

F.   COUNTY & CCSO AUTONOMY FROM THE STATE OF SOUTH CAROLINA

204.     As discussed *supra*, Charleston County's decision to place or remove County law

enforcement authority into the hands of CCSO and its Deputies was done with complete autonomy

from The State of South Carolina.

205.     Additionally, Charleston County, as a matter of County policy, has elected to

provide assistance to motorists with vehicle issues on its roads who call Dispatch looking for help.

206.     Charleston County also determined and determines what resources of the County

are to be deployed in response to these motorists' requests.

207.     Charleston County has directed Dispatch to use the CCSO and its Deputies to

respond to these non-law enforcement requests for motorist assistance on County roadways.

208.     The County could have elected to instruct Dispatch to use non-law enforcement

personnel, such as a Community Services Vehicle operated by a mechanic (as used by SCDOT,

Town of Mount Pleasant, and others) to respond to a motorist request, call the motorist a tow truck,

or not provide any motorist assistance at all.

209.     In turn, CCSO has promulgated a policy as to the specifics of how Charleston

County via CCSO Deputies are to respond to requests for motorist assistance within the County.

210.     *CCSO Policy 7-09 Ancillary Traffic Services,* is a policy created, adopted, and

implemented by the CCSO with complete autonomy from the State of South Carolina, solely for

the benefit of motorists in Charleston County per the policy and authority of the County: "It is the

policy of the Charleston County Sheriff's Office to provide reasonable assistance to motorists

traveling the roads and highways of Charleston County." (emphasis added).

211.    Therefore, when CCSO Deputies Pelletier and Sacks were responding to a non-law enforcement request for motorist assistance in Charleston County, they were engaged in a purely County function, pursuant to a County policy, and per County authority given unto them via the CCSO with complete autonomy from the State of South Carolina.

212.    Further, the County is also supposed to be involved directly in the supervision and discipline of Deputies and their driving following collisions in County Vehicles pursuant to the CCSO policies and the Vehicle Collision Review Board ("VCRB").

213.    Charleston County's policymaking as to the entirety of the VCRB, and in turn, supervision and discipline of Deputy driving, is likewise done with complete autonomy from the State as to a matter of purely Charleston County concern.

214.    As to the policies and/or customs of the CCSO as to how a Deputy, a county employee, is supervised and/or disciplined for their driving on roads in the county, the Sheriff is the final policymaker for this County concern and her policymaking, and Deputy Driving itself, does not involve any statewide concern.

215.    Accordingly, how Sheriff Graziano and/or her predecessor Sheriff Cannon supervise and discipline Deputies for their driving on roads in the County, especially when those Deputies are not engaged in a "law enforcement" function, is a purely administrative matter as to these County employees and is done by her with complete autonomy from the State same as is done by any other County Department head for their employees who use County Vehicles.

G.  CONTROL OF THE SHERIFF BY THE CITIZENS OF CHARLESTON COUNTY

216.    The members of Charleston County Council are elected by the citizens of Charleston County.

217.    The Sheriff of Charleston County is also elected by the citizens of Charleston County.

218.    As was discussed, *supra*, County law enforcement authority rests in the office of the Charleston County Sheriff because Charleston County has not decided to remove that authority and reinstate the Charleston County Police Department.

219.    Lastly, it is ultimately the citizens of Charleston County who are the only ones with (a) the power to remove the County Sheriff either by vote in the ballot box on election day or (b) can suspend the County Sheriff via a majority vote of a grand jury returning an indictment against the Sheriff.

## H.  CONCLUSION

220.    As set forth *supra,* the State of South Carolina has no liability and has no funds at risk from the claims of the Plaintiffs.

221.    For any and all these facts set forth *supra,* the CCSO is an entity capable of being sued under 42 U.S.C. §1983.

## 42 U.S.C. 1983 *Monell* LIABILITY

222.    At all times material to this Complaint, Charleston County, acting by and through its agents and policymakers as set forth *supra*, were at all times acting under color of state law.

223.    At all times material to this Complaint, CCSO, acting by and through Sheriffs Cannon and Graziano, and its agents and policymakers, and Deputies, including Defendants Pelletier and Sacks, as set forth *supra*, were at all times acting under color of state law.

224.    Through the policies, customs, actions, and inactions as alleged *supra*, the dangerous driving and unlawful misuse of County Vehicles by Deputies documented in the Deputy Driving Data related to same, Defendants Charleston County, CCSO, and their policymakers, all had both actual and constructive knowledge that Charleston County citizens and others on roads

in Charleston County were experiencing recurrent and numerous violations of their 14th Amendment rights by the dangerous driving and/or unlawful misuse of County Vehicles by Deputies pursuant to these policies, customs, actions and inactions.

225.     These policies, customs, actions, and inactions by Charleston County and/or CCSO as alleged *supra*, implicitly and at times expressly, ratified the dangerous driving and unlawful misuse of County Vehicles by Deputies, and created a culture whereby Deputies, including Defendants Pelletier and Sacks, knew that there was no supervision, monitoring, discipline, and/or accountability for their dangerous driving and/or unlawful misuse of County Vehicles unless and until that driving resulted in a property loss, injury, or loss of life, including 14th Amendment violations of those that Deputies injured or killed.

226.     At all times material to this Complaint, and as alleged *supra*, Defendants Charleston County, CCSO, and its policymakers, all acted with recklessness and deliberate indifference constituting a conscious disregard to the clearly established Fourteenth Amendment rights of Shanice, Miranda, and their mother Stephanie, by ratifying, condoning, and failing to take any actions to monitor, supervise, stop, correct, or discipline these known and ongoing violations of clearly established Fourteenth Amendment rights resulting from the dangerous driving and unlawful misuse of County Vehicles by Deputies that proximately caused and resulted in the catastrophic injuries and death of Shanice, Miranda, and their mother Stephanie, including those of their heirs and statutory beneficiaries in their familial relationships with the decedents.

### FOR A FIFTH CAUSE OF ACTION
### (42 U.S.C. § 1983 – Municipal Liability Official Policy)

227.     All allegations made in the preceding paragraphs are re-alleged as if fully set forth herein.

228.     At all times material to this Complaint, Defendants Charleston County and/or

CCSO acting by and through their agents and policymakers as alleged *supra*, had official policies of deliberate indifference constituting a conscious disregard of the clearly established Fourteenth Amendment substantive due process rights and safety of the citizens of Charleston County and others on its roads in the County, including Shanice, Miranda, and their mother Stephanie, who came in contact with Deputies engaged in dangerous driving and/or unlawful misuse of County Vehicles, and that was documented in the Deputy Driving Data related to same including Defendants Pelletier and Sacks.

229.    These policies were the moving force that caused the injury and death of Shanice, Miranda, and their mother Stephanie, and not only violated their clearly established Fourteenth Amendment substantive due process rights as set forth *supra,* but also violated the substantive due process rights of their heirs and statutory beneficiaries in their familial relationships with the decedents.

230.    Further, Charleston County is liable to fund the CCSO to satisfy any judgment rendered against CCSO and/or Sheriff Graziano in her official capacity pursuant to 42 U.S.C. § 1983, as discussed *supra,* for any one or more of the following reasons:

    a. that the General Assembly has determined that the CCSO is to be financed entirely by public funds appropriated to it by the County;

    b. that the County Sheriff lacks the authority to levy taxes and/or establish a budget;

    c. the County is statutorily obligated to fund the CCSO, and pays for the training, salaries, and benefits of its Deputies who are classified and paid as County employees;

    d. the County indemnifies CCSO from all risks of its operations through the purchase of insurance and/or payment of claims made against CCSO; and

    e. the County pays for all liabilities incurred by CCSO incidental to the proper transaction of CCSO's legitimate business.

## FOR A SIXTH CAUSE OF ACTION
### (42 U.S.C. § 1983 – Municipal Liability Unofficial Policy / Custom)

231.    All allegations made in the preceding paragraphs are re-alleged as if fully set forth herein.

232.    At all times material to this Complaint, Defendants Charleston County and/or CCSO acting by and through their agents and policymakers as alleged *supra*, had unofficial policies and/or customs that were so persistent as to become standard operating procedure and/or policy, of deliberate indifference constituting a conscious disregard of the clearly established Fourteenth Amendment substantive due process rights and safety of the citizens of Charleston County and others on its roads including Shanice, Miranda, and their mother Stephanie, who came in contact with Deputies engaged in dangerous driving and/or unlawful misuse of County Vehicles, including Defendants Pelletier and Sacks.

233.    These unofficial policies and/or customs were the moving force that caused the injury and death of Shanice, Miranda, and their mother Stephanie, and not only violated their clearly established Fourteenth Amendment substantive due process rights as set forth *supra,* but also violated the substantive due process rights of their heirs and statutory beneficiaries in their familial relationships with the decedents.

234.    Further, Charleston County is liable to fund the CCSO to satisfy any judgment rendered against CCSO and/or Sheriff Graziano in her official capacity pursuant to 42 U.S.C. § 1983, as discussed *supra,* for any one or more of the following reasons:

a. that the General Assembly has determined that the CCSO is to be financed entirely by public funds appropriated to it by the County;

b. that the County Sheriff lacks the authority to levy taxes and/or establish a budget;

c. the County is statutorily obligated to fund the CCSO, and pays for the training, salaries, and benefits of its Deputies who are classified and paid as County employees;

d. the County indemnifies CCSO from all risks of its operations through the purchase of insurance and/or payment of claims made against CCSO; and

e. the County pays for all liabilities incurred by CCSO incidental to the proper transaction of CCSO's legitimate business.

## FOR A SEVENTH CAUSE OF ACTION
### (42 U.S.C. § 1983 – Municipal Liability - Failure to Train, Supervise, and Discipline)

235.    All allegations made in the preceding paragraphs are re-alleged as if fully set forth herein.

236.    As alleged *supra*, Defendants CCSO and/or Charleston County inadequately trained, supervised, and/or disciplined employees and agents, including Deputies as to their dangerous driving and/or unlawful misuse of County Vehicles.

237.    As alleged *supra*, this failure to train, supervise, and/or discipline Deputies for their dangerous driving and/or unlawful misuse of County Vehicles has led to tacit, and at times, express condonation of their dangerous driving and/or unlawful use of County Vehicles and repeated violations of Fourteenth Amendment Rights.

238.    The failure to adequately train, supervise, and/or discipline was done with recklessness and deliberate indifference constituting a conscious disregard to the clearly established Fourteenth Amendment substantive due process rights and safety of the citizens of Charleston County and others on its county roadways including Shanice, Miranda and their mother Stephanie, who came in contact with Deputies engaged in dangerous driving and/or unlawful misuse of County Vehicles, including Defendants Pelletier and Sacks, especially as Deputy Driving Data easily allowed for supervision and documentation of each and every act of dangerous driving and/or unlawful misuse of County Vehicles by Deputies.

239.    The failure to adequately train, supervise, and/or discipline Deputies and others regarding the dangerous driving and/or unlawful misuse of County Vehicles by Deputies,

including Defendants Pelletier and Sacks, were the moving force that caused the injury and death of Shanice, Miranda, and their mother Stephanie, and not only violated their clearly established Fourteenth Amendment substantive due process rights as set forth *supra,* but also violated the substantive due process rights of their heirs and statutory beneficiaries in their familial relationships with the decedents.

240.    Further, Charleston County is liable to fund the CCSO to satisfy any judgment rendered against CCSO and/or Sheriff Graziano in her official capacity pursuant to 42 U.S.C. § 1983, as discussed *supra,* for any one or more of the following reasons:

a.  that the General Assembly has determined that the CCSO is to be financed entirely by public funds appropriated to it by the County;

b.  that the County Sheriff lacks the authority to levy taxes and/or establish a budget;

c.  the County is statutorily obligated to fund the CCSO, and pays for the training, salaries, and benefits of its Deputies who are classified and paid as County employees;

d.  the County indemnifies CCSO from all risks of its operations through the purchase of insurance and/or payment of claims made against CCSO; and

e.  the County pays for all liabilities incurred by CCSO incidental to the proper transaction of CCSO's legitimate business.

### FOR AN EIGHTH CAUSE OF ACTION
### (Survival Action & Damages)

241.    All allegations made in the preceding paragraphs are re-alleged as if fully set forth herein.

242.    As a direct and proximate result of any one or more of the acts and/or omissions of any one or more of the Defendants as set forth, *supra*, Shanice, Miranda. and Stephanie suffered fear, physical pain and suffering, mental and emotional distress and anguish in the time before their deaths, as well as property damage, and their respective estates further incurred funeral expenses and are entitled to an award of all damages pursuant to S.C. Code Ann. § 15-5-90 and the common law of South Carolina.

## FOR A NINTH CAUSE OF ACTION
### (Wrongful Death Action & Damages)

243.    All allegations made in the preceding paragraphs are re-alleged as if fully set forth herein.

244.    As a direct and proximate result of any one or more of the acts and/or omissions of any one or more of the Defendants as set forth, *supra*, Shanice, Miranda and Stephanie suffered fear, physical pain and suffering, mental and emotional distress and anguish and then died.

245.    As a result of their deaths, their heirs and statutory beneficiaries have lost their aid, comfort, support, society and companionship, and have suffered severe and extreme emotional distress, anxiety, grief and sorrow, and pecuniary losses for which the Plaintiffs are entitled to recover, on behalf of the statutory beneficiaries, damages pursuant to S.C. Code Ann.§ 15-51-10, et. seq., and the common law of South Carolina.

## FOR AN TENTH CAUSE OF ACTION
### (42 U.S.C. § 1988 – Attorney Fees)

246.    All allegations made in the preceding paragraphs are re-alleged as if fully set forth herein.

247.    Plaintiffs are also entitled to reasonable costs and attorney fees pursuant to 42 U.S.C. § 1988 and applicable statutes and laws.

## PUNITIVE DAMAGES

248.    All allegations made in the preceding paragraphs are re-alleged as if fully set forth herein.

249.    Plaintiffs are further entitled to punitive damages for the grossly negligent, wanton and/or reckless acts and/or omissions of any one or more of the Defendants as alleged herein.

**WHEREFORE**, Plaintiffs pray for judgment against the Defendants, for all damages each may be lawfully entitled to, as may be determined and awarded by a jury against each Defendant, jointly and severally, and for such other and further relief as may be deemed appropriate by the jury and this Court, including attorney fees and costs.

Respectfully Submitted,

**ATTORNEY FOR PLAINTIFF
RANDALL WILLIAMS, PERSONAL
REPRESENTATIVE**

*/s/ Richard A. Hricik*

_____
Richard A. Hricik (#16871)
THE LAW OFFICES OF
RICHARD A. HRICIK, PA
941 Houston Northcutt Blvd. Ste 204
Mt. Pleasant, SC 29464
(O) 843.849.0136
Richard@CharlestonLawyer.com

**ATTORNEY FOR PLAINTIFF
BETTY SIMMONS, PERSONAL
REPRESENTATIVE**

*/s/ Clifford Bush, III*

_____
Clifford Bush, III (#17026)
The Law Office of Clifford Bush, III, LLC
28 Old Jericho Road
Beaufort, South Carolina 29906
O (843) 379-9500
cbush@lawofficeofcbushiii.com

Charleston, South Carolina
October 4, 2023

**Trial by Jury Requested pursuant to FRCP 38**

*/s/ Richard A. Hricik*

_____
Richard A. Hricik (#16871)

*/s/ Clifford Bush, III*

_____
Clifford Bush, III (#17026)